FRANCIS LEVIEN AND JANICE LEVIEN, PETITIONERS
*v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 9006–90.         Filed August 2, 1994.

*Richard P. Swanson* and *Marc D. Teitelbaum,* for petitioners.

*Bruce Wilpon* and *Patricia Beary,* for respondent.

OPINION

RUWE, *Judge:* Respondent determined deficiencies, additions to tax, and additional interest against petitioners as follows:

| Year | Deficiency | Additions to tax sec. 6659 | Additional interest sec. 6621(c) |
|------|-----------|---------------------------|----------------------------------|
| 1983 | $89,609 | $26,883 | 120% of the interest due on $89,609 |
| 1984 | 68,210 | 20,463 | 120% of the interest due on $68,210 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent has conceded the additions to tax, and the parties have stipulated the outcome of certain issues. Only two issues remain for us to decide. Those issues arise in connection with losses claimed by petitioners from an investment by petitioner husband (hereafter petitioner) in a computer leasing activity (sometimes, the activity). We must decide whether such losses are disallowed pursuant to section 465 and whether petitioners are liable for additional interest.

## Background

The parties have submitted this case fully stipulated, pursuant to Rule 122(a). The stipulation of facts entered into by the parties and exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Palm Beach, Florida, at the time they filed the petition herein. During the years in issue, petitioners, who were calendar year taxpayers, filed joint income tax returns. Following is a summary of certain relevant facts.

## I. *Petitioner's Transactions*

On December 20, 1983, petitioner entered into an agreement to purchase five units of interest in certain computer equipment for a total purchase price of $543,750.[1] The seller of those units was a Delaware corporation, Aardan Leasing Corp. (Aardan). Petitioner paid for his units by delivering to Aardan both cash and notes. Petitioner paid cash of $11,250. He also executed two short-term notes (the short-term notes) and one long-term note (the long-term note) in favor of Aardan. The short-term notes were each in the principal amount of $21,875, with one due in April 1984 and the other due in January 1985. Petitioner's liability was not limited under either short-term note. The long-term note was in the principal amount of $488,750. Principal and interest on the long-term note were due and payable on December 31, 1998. Prepayment was mandatory, however, to the extent of certain proceeds received by petitioner in connection with his interest in the computer equipment (principally, rental payments received from a lease of the equipment). Petitioner's personal liability under the long-term note was limited to $325,000. The five units of interest petitioner purchased in the computer equipment gave him an approximately one-for-tieth interest (2.665560 percent) in the equipment. Subsequent to agreeing to purchase his interest in the computer equipment, petitioner entered into a lease of that interest, as described below. On their 1983 and 1984 Federal income tax returns, petitioners claimed losses of $83,333 and $161,727, respectively, on account of such transactions.

## II. *Preceding Sales*

The computer equipment in which petitioner acquired an interest from Aardan was acquired by Aardan in two transactions. In the first, on December 31, 1983, Aardan acquired computer equipment from a partnership, Equilease Associ-

---

[1] Exhibit 11–K is entitled "Equipment Purchase Agreement". Exhibit A to that agreement states the purchase price of the equipment to be $500,000, yet calls for cash and notes equaling a stated 108.75 percent of that amount, or $543,750. Exhibit 23–W is entitled "Security Agreement". Sec. 1 thereof describes two short-term notes (described herein, *infra,* in the total amount of $43,750) that represent interest payments on a long-term note (also described *infra*). The parties have stipulated that petitioner paid $543,750 in cash and notes for the purchase of his interest in the computer equipment in question. We have found that petitioner *agreed to pay* $543,750 for that interest. We have based our finding on stipulation 20, notwithstanding the contradictory evidence in the stipulated exhibits.

ates III Ltd. Partnership (Associates), a Connecticut limited partnership. The purchase price of that equipment (the Associates equipment) to Aardan was $1,013,548. Aardan paid $22,805 in cash and delivered its note, in the principal amount of $990,743, for the balance. That note called for an immediate payment of $68,414, applicable to the first 2 years' interest, and mandatory prepayments, out of certain proceeds, with any balance of interest and principal due on December 31, 2003. The Associates equipment was acquired by Aardan subject to (1) certain liens created when Associates acquired that equipment, and (2) certain leases of the equipment to users thereof. On or before the day that Associates sold the Associates equipment to Aardan, Associates purchased that equipment from a corporation, Equilease Marketing Corp. At that time, the Associates equipment was under lease and sublease to Chemco Leasing GmbH and Hessischer Rundfunk, respectively (foreign business organizations).

The second transaction by which Aardan acquired the computer equipment in question also occurred on December 31, 1983. Aardan acquired computer equipment from Equilease Equipment Brokerage C.V. (C.V.) (also a foreign business organization). The purchase price of that equipment (the C.V. equipment) to Aardan was $17,744,237. Aardan paid $399,245 in cash and delivered its installment note in the principal amount of $17,344,992 for the balance. That note called for an immediate payment of $1,197,736, applicable to the first 2 years' interest, mandatory prepayments, out of certain proceeds, with any balance of interest and principal due on December 31, 2003. As with the Associates equipment, the C.V. equipment was acquired by Aardan subject to (1) certain liens created when C.V. acquired that equipment, and (2) certain leases of the equipment to users thereof. On or before the day that C.V. sold the C.V. equipment to Aardan, C.V. purchased that equipment from various leasing companies in Europe. The C.V. equipment was already under lease when purchased by C.V.

III. *Lease by Petitioner*

On December 31, 1983, petitioner, along with the other owners of interests in the Associates and C.V. equipment

(collectively, the tenants in common) retained an agent, Equitable Leasing Co., Inc. (Equitable), to act on their behalf in connection with certain contemplated leasing activities. On that same date, the tenants in common, through Equitable, leased both the Associates equipment and the C.V. equipment to Associates and C.V., respectively. The rental term in each case was from December 31, 1983, through June 30, 1991. The total rental due under the lease to C.V. was $25,457,997.54, with monthly payments of $94,303.18, from January 31, 1984, through December 31, 1985, and of $351,435.17, beginning January 31, 1986, and continuing for the next 65 months. The total rental due under the lease to Associates was $1,454,158.08, with monthly payments of $5,386.64 from January 31, 1984, through December 31, 1985, and of $20,073.92, beginning January 31, 1986, and continuing for the next 65 months.

## IV. *Related Agreements*

On December 31, 1983, Aardan and petitioner, by petitioner's agent, Equitable, entered into an agreement to secure petitioner's obligations to pay its notes to Aardan. Petitioner accorded to Aardan security interests in (1) his fractional interests in the computer equipment purchased from Aardan, and (2) his rights under the agreements to lease that equipment to Associates and C.V. Aardan had the right to collect the rent due petitioner under those agreements. Associates' and C.V.'s obligations to pay rent to the tenants in common (including petitioner) were secured by assignments of their rights to collect rent from their own lessees, respectively.

On December 31, 1983, petitioner, by petitioner's agent, Equitable, and a corporation named Equilease Corp. (Equilease) entered into two separate agreements, one with respect to the lease to Associates and one with respect to the lease to C.V. Under those agreements, styled "Capitalization Agreement", Equilease agreed "to make all necessary loans, advances or capital contributions to C.V. and Associates, respectively, to ensure the payment by C.V. and Associates" of rents to the tenants in common. Equilease's obligations were contingent on Aardan's continuing to make payments on its notes to Associates and C.V. for purchase of the Associates and C.V. equipment, respectively.

Equilease is stipulated to be an "affiliate" of both C.V. and Associates.[2]

## V. *Coincidence of Payments*

Monthly payments received pursuant to the rental obligations of Associates and C.V. by the tenants in common (including petitioner) equal the monthly obligation of the tenants in common to pay Aardan for the computer equipment, which sum also equals the monthly obligations of Aardan to pay Associates and C.V. for such equipment. Similarly, petitioner's percentage of the rental payments received from C.V. and Associates equals the prepayment that he was obliged to make to Aardan on the long-term note.

## *Discussion*

### *At Risk*

Section 465 limits losses allowable to an individual in connection with certain activities to the amount that the individual is "at risk" with regard to the activity at yearend. The activity here in question is one to which section 465 applies.[3] Sec. 465(c)(1)(C). Respondent agrees that petitioner was at risk with regard to (1) the cash he contributed to the activity, and (2) payments he made on the short-term notes.[4]

---

[2] On brief, petitioners state that C.V. is a shell subsidiary of Equilease and that Associates is an "affiliate" of Equilease.

[3] The parties agree that petitioner's computer sale and leaseback transaction had economic substance and that petitioner reasonably expected to make an economic profit from the transaction exclusive of tax benefits. In addition, the parties agree that petitioner shared the benefits and burdens of ownership of the computer equipment.

[4] In their briefs, the parties have proposed various findings of fact. With regard to the short-term notes, there appears to be a conflict concerning the timing of petitioner's becoming at risk with regard to those notes. Respondent asks that we find that petitioner's amounts at risk include "payments made" on the short-term notes. We assume that respondent is asking us to find that petitioner became at risk with regard to the short-term notes only as, and to the extent that, he made payments on those notes. Petitioners simply request a finding that petitioner was at risk with regard to the short-term notes. We interpret petitioners' request to be a request for a finding that petitioner became at risk with regard to the short-term notes at the time he executed those notes. Neither respondent's notice of deficiency nor the pleadings address this timing issue. Respondent's notice simply states that "gains or losses are limited to your [petitioner's] amount at risk", while the petition equally simply says that respondent has made an erroneous determination, and that petitioner's amount at risk is not limited to his initial cash contribution. On brief, respondent sets forth as the only question presented with regard to the at-risk issue, whether the long-term note is part of petitioner's at-risk amount. The stipulation of facts entered into by the parties leads us to believe that the short-term notes were paid in full, the first in 1984 and the second in 1985. We interpret respondent's failure to state any question with regard to the timing issue concerning the two short-term notes as a concession

Respondent contends, however, that, with respect to the long-term note, petitioner was not at risk because he was protected against loss within the meaning of section 465(b)(4).

Section 465(b)(4) provides:

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

In determining whether a taxpayer is protected against loss within the meaning of section 465(b)(4), we look to see whether there is any realistic possibility that the taxpayer ultimately will be subject to economic loss on the investment at issue. *Thornock v. Commissioner*, 94 T.C. 439, 453 (1990).

[T]he purpose of subsection 465(b)(4) is to suspend at risk treatment where a transaction is structured—by whatever method—to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable. A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection. We must be guided by economic reality. * * * [*Waters v. Commissioner*, 978 F.2d 1310, 1315 (2d Cir. 1992), affg. T.C. Memo. 1991–462 (quoting with approval *American Principals Leasing Corp. v. United States*, 904 F.2d 477, 483 (9th Cir. 1990)).]

The question presented is one of fact, and petitioners bear the burden of proof. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933).[5] With regard to leasing activities, we scrutinize the economic reality of the transaction, focusing in particular upon the relationships between the parties, whether the underlying debt is nonrecourse, the presence of offsetting payments and bookkeeping entries, the circularity of the transaction, and the presence of any payment guarantees or indemnities. See *Waters v. Commissioner*, 978 F.2d 1310, 1316–1317 (2d Cir. 1992), affg. T.C. Memo. 1991–462; *Young v. Commissioner*, 926 F.2d 1083, 1088 (11th Cir. 1991), affg. T.C. Memo. 1988–440; *Moser v. Commissioner*, 914 F.2d 1040, 1049–1050 (8th Cir. 1990), affg. T.C. Memo. 1989–142; *American Principals Leasing Corp. v. United States*, 904 F.2d

---

of any issue raised by the seeming conflict in the proposed findings of fact. We have found the short-term notes to have been part of the purchase price petitioner agreed to pay for his interest in the computer equipment. We will treat petitioner as becoming at risk with regard to the two short-term notes as of the date he executed them, Dec. 20, 1983.

[5] Petitioners' burden of proof remains unchanged despite the fact that this case was fully stipulated. Rule 122(b); *Borchers v. Commissioner*, 95 T.C. 82 (1990), affd. on other issues 943 F.2d 22 (8th Cir. 1991).

477, 483 (9th Cir. 1990); *Thornock v. Commissioner, supra* at 453. No single feature of the transaction generally will control. *Thornock v. Commissioner, supra* at 449.

We find no significant difference between the facts in this case and those in the cases cited above. For example, *Young v. Commissioner, supra,* involved similar sale/leaseback transactions, whereby the taxpayers purchased computer equipment from a middle entity that purchased the equipment from third parties to which the taxpayers leased the equipment. The rental payments in *Young* were equal to or in excess of the payments required under the taxpayers' purchase agreements to the middle entity. Based on these factors, the Court of Appeals for the Eleventh Circuit held that the taxpayers were not at risk under section 465(b)(4).[6] As stated by the Court of Appeals, "The chain of 'payments' could either continue as bookkeeping entries or cease, and there would be no actual circumstance upon which a demand for a payment would be made. See *American Principals Leasing Corp. v. United States,* 904 F.2d 477, 483 (9th Cir. 1990)". *Id.* at 1088. Likewise, in *Thornock v. Commissioner, supra* at 451, this Court found that taxpayers involved in a similar computer leasing structure were not at risk due primarily to the existence of guarantees, the offsetting nature of lease and note payments, and the nonrecourse nature of the underlying debt.

In the instant case, all the important elements relied upon in the previously cited cases are present. All monthly obligations were exactly offset, including the rental obligations of C.V. and Associates to the tenants in common (including petitioner), petitioner's obligations to Aardan, and Aardan's obligations to C.V. and Associates. The payments simply self-extinguished via offsetting bookkeeping entries. The master leases (evidencing rental payments due from C.V. and Associates), the long-term notes (evidencing installment obligations to Aardan from the tenants in common), and the purchaser notes (evidencing Aardan's obligations to C.V. and Associates) commenced on the same date and were to terminate on the same date. As in the previous cases, the transaction was circular, with a middle entity (Aardan) connecting the tax-

---

[6] Appeal in the instant case lies to the Court of Appeals for the Eleventh Circuit. See *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

payer and third-party lessees (C.V. and Associates). Thus, it was highly unlikely that any one of the parties would refuse to meet an obligation. As stated in *American Principals Leasing Corp. v. United States, supra* at 483, "if one party failed to 'pay', he could only expect a chain reaction resulting in his obligor's ceasing 'payment' as well." In addition, the rental payments of C.V. and Associates were guaranteed by an affiliate, Equilease.

Finally, as in both *Young* and *Thornock,* petitioners on brief concede that the underlying financing used by the original leasing companies, from whom C.V. and Associates purchased the computer equipment, was nonrecourse. See also *Moser v. Commissioner, supra* at 1050.

The relationships among the parties to the transaction, as evidenced by the master leases, the purchaser notes, and the long-term notes, show that great pains were taken to ensure that no economic loss would be sustained by the tenants in common as a result of their execution of the long-term note. In paragraph 18 of the master lease agreements, Associates and C.V. agreed to indemnify the tenants in common against any and all as losses incurred for, or by reason of the leasing of, the equipment.[7] The tenants in common were explicitly provided with all the usual legal remedies in the event that one of the other parties defaulted on its obligations, including the ability to sue Aardan for breach of warranty and C.V. and Associates for nonpayment.

Petitioners request that we analyze the facts herein based on the "worst case scenario" test that was articulated by the court in *Emershaw v. Commissioner,* 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990–246. They contend that, based upon this test—as opposed to the "realistic possibility of economic loss" analysis upon which we base our decision—petitioner's transaction did not constitute a loss-protection scheme or a prohibited "other similar arrangement". We previously addressed a similar argument in *Wag-A-Bag, Inc. v. Commissioner,* T.C. Memo. 1992–581, in which we determined that "whichever standard is used, the ultimate decision rests upon the substance of the transaction in light of

---

[7] Indeed, according to the promotional letter for the transaction, Equilease went so far as to agree to repurchase the equipment at the price paid by the tenants in common plus a reasonable interest factor if certain potential tax law changes retroactively rendered the transaction unprofitable.

all the facts and circumstances."[8] We continue to hold to the view—expressed in *Wag-A-Bag*—that, under section 465(b)(4), economic reality should be the touchstone of the analysis.[9]

Petitioners do not deny that the individual factors discussed above were present in petitioner's leasing transactions. However, petitioners attempt to obscure what appears to be the economic reality of the transactions by arguing that each piece of the transactions, standing alone, did not protect the tenants in common against loss. Petitioners also attempt to distinguish the numerous cases with similar facts and unfavorable conclusions on the basis of factors present or not present in those other cases. We reject these arguments. We adhere to our position that it is the substance of the transaction, rather than the form, which is controlling and that substance is determined by looking at all the material facts. *Thornock v. Commissioner, supra* at 449. As stated above, we discern no material difference between the facts of this case and those in the numerous cases cited above.

In *Porreca v. Commissioner,* 86 T.C. 821, 838 (1986), we observed that while the legislative history of section 465 does not define what is meant by "other similar arrangements", the phrase "[evidences] concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable." We find this an apt description of petitioner's transactions. After consideration of all the elements described above, petitioners have failed to convince us that petitioner was not protected against loss within the meaning of section 465(b)(4).

---

[8] But see *Martuccio v. Commissioner,* 30 F.3d 743 (6th Cir. 1994), revg. and remanding T.C. Memo. 1992–311.

[9] While our opinion in *Wag-A-Bag, Inc. v. Commissioner,* T.C. Memo. 1992–581, downplays the differences between application of the "worst case scenario" and "realistic possibility of economic loss" tests, other courts have viewed the distinctions between the two as more fundamental and have rejected the application of the "worst case scenario" for purposes of sec. 465(b)(4). See *Waters v. Commissioner,* 978 F.2d 1310, 1315–1316 (2d Cir. 1992), affg. T.C. Memo. 1991–462; *Young v. Commissioner,* 926 F.2d 1083, 1089 n.14 (11th Cir. 1991), affg. T.C. Memo. 1988–440; *Moser v. Commissioner,* 914 F.2d 1040, 1049–1050 (8th Cir. 1990), affg. T.C. Memo. 1989–142; *American Principals Leasing Corp. v. United States,* 904 F.2d 477, 482 (9th Cir. 1990).

*Section 6621(c)*

Respondent also seeks increased interest pursuant to section 6621(c). That section provides for an increase in the interest rate to 120 percent of the statutory rate on underpayments of tax if a substantial understatement is due to a tax-motivated transaction. Certain transactions are deemed to be "tax motivated" by section 6621(c)(3), including any loss disallowed under section 465(a). Sec. 6621(c)(3)(A)(ii). Since we have concluded that the loss deductions in issue stemming from petitioner's long-term note to Aardan are disallowed under section 465(a), we also find that this was a tax-motivated transaction, and respondent is entitled to additional interest on the interest accruing on the portion of the underpayment attributable to such transaction after December 31, 1984.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

HAMBLEN, PARKER, COHEN, SWIFT, GERBER, WRIGHT, PARR, WELLS, COLVIN, BEGHE, CHIECHI, and LARO, *JJ.,* agree with this majority opinion.

---

HALPERN, *J.,* concurring:

I. *Introduction*

I concur in the result reached by the majority. I write separately only because I think that the majority has unnecessarily looked too far to see whether petitioner husband (petitioner) was protected against loss within the meaning of section 465(b)(4). The majority has determined that, with respect to the long-term note, petitioner was protected against loss through an "other similar arrangement", as that term is used in section 465(b)(4). Majority op. p. 129. In its analysis, the majority has totally disregarded the nonrecourse aspect to the long-term note and accorded only make-weight status to the rent guarantees. "Nonrecourse financing" and "guarantees" are specifically enumerated in section 465(b)(4). Because petitioners have conceded that petitioner was not at risk with respect to the nonrecourse portion of the long-term note ($163,750), and have argued

that the rent guarantees should be disregarded in their entirety, I see no need to find or cumulate factors as the majority has done in order to determine whether petitioner was protected against loss through an arrangement that is *similar to* either nonrecourse financing, a guarantee, or a stop-loss agreement. Petitioners have failed to show that the protection against loss afforded petitioner by the nonrecourse financing and guarantees is insufficient to eliminate any risk otherwise attendant to petitioner's investment of the proceeds of the long-term note. I would so hold.

## II. *Nonrecourse Financing*

Where a note has been partially recourse, we have looked no further to determine that, to the extent of the nonrecourse portion of the note, the taxpayer was not at risk for purposes of section 465(b). See, e.g., *B&A Distributing Co. v. Commissioner,* T.C. Memo. 1988–589 (limited recourse promissory note); cf. *Berger v. Commissioner,* T.C. Memo. 1994–298 (attempt to add recourse feature to nonrecourse note).

## III. *Guarantees*

### A. *The Guarantee*

Equilease, under the capitalization agreements, guaranteed Associates' and C.V.'s obligations to pay rent to the tenants in common (including petitioner). To quote the majority:

Equilease agreed "to make all necessary loans, advances or capital contributions to C.V. and Associates, respectively, to ensure the payment by C.V. and Associates" of rents to the tenants in common. Equilease's obligations were contingent on Aardan's continuing to make payments on its notes to Associates and C.V. for purchase of the Associates and C.V. equipment, respectively. [Majority op. p. 124.]

### B. *Precedent*

There is no case in which we have explored the meaning of the term "guarantee", as that term is used in section 465(b)(4). A dictionary definition includes the following: "A pledge that something will be performed in a specified manner. * * * A guaranty by which one person assumes responsibility for paying another's debts or fulfilling another's responsibilities." American Heritage Dictionary of the English Language (3d ed. 1992). Nevertheless, guarantees and

similar arrangements have played a role in our determining that a taxpayer was not at risk on account of section 465(b)(4). For example: In *Thornock v. Commissioner,* 94 T.C. 439, 451 (1990), rent guarantees were a primary factor leading us to find that "no realistic possibility existed that the * * * [taxpayers] would be ultimately liable to make any payments on * * * [their] debt obligations". In *Capek v. Commissioner,* 86 T.C. 14 (1986), we dealt with a coal mining program that required the taxpayer in question to pay certain advance royalties. A mining company was to pay penalties to the taxpayer if the mining company failed to mine the land leased by the taxpayer. We stated that it was obvious from the facts of the case that "the effect of the penalty provision was to protect an investor from any loss on the recourse note executed by him in favor of * * * [a lender who advanced the required advance royalty payments]". *Id.* at 52. We concluded that "the penalty provisions in the mining contracts were stop loss agreements or other similar arrangements within the meaning of section 465(b)(4)." *Id.* at 53.

## C. *Eliminating the Risk of Default*

In *Thornock v. Commissioner, supra,* and *Capek v. Commissioner, supra,* we examined the guarantees there in question with an eye to determining whether the taxpayer had insured against his liability to repay borrowed funds contributed by him to the activity. Such a determination is appropriate because there is no doubt that, if a taxpayer borrows funds for use in a section 465 activity and obtains insurance against his personal obligation to repay those funds, he will not be considered at risk with regard to those funds for purposes of section 465(b)(2). See sec. 465(b)(4).[1] Presumably, the taxpayer will not be considered at risk because he has eliminated the economic risk to himself of a deficiency judgment against him should he default on his

---

[1] Sec. 465 was added to the Code by sec. 204(a) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1531. In the Senate, S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49 (S. Rept. 94–938), accompanied H.R. 10612, which became the Tax Reform Act of 1976. In pertinent part, S. Rept. 94–938 states:

if a taxpayer is personally liable on a mortgage but he separately obtains insurance to compensate him for any payments which he must actually make under such personal liability, the taxpayer is at risk only to the extent of the uninsured portion of the personal liability to which he is exposed. * * * [1976–3 C.B. (Vol. 3) at 88; fn. ref. omitted.]

personal obligation. The economic risk that he has eliminated is the risk that, upon his default, he would be called upon to make up the difference between his indebtedness and the amount realized from a sale of the property securing that indebtedness. That risk (the risk of default) has been shifted to the insurer. Indeed, when the Commissioner has argued that a taxpayer is protected against loss with respect to a particular debt obligation, we have characterized our inquiry under section 465(b)(4) as follows: "who realistically will be the payor of last resort if the transaction goes sour and the secured property associated with the transaction is not adequate to pay off the debt[?]". *Levy v. Commissioner,* 91 T.C. 838, 869 (1988).

## D. *Assuring the Value of the Investment*

Most investments require at least some of the investor's own funds (equity capital) in addition' to borrowed funds (debt capital). Section 465 clearly contemplates that an investor may be at risk with respect to equity capital. Compare sec. 465(b)(1)(A) with (B). Section 465(b)(4) just as clearly contemplates that an investor will not be considered at risk to the extent that his equity capital is protected against loss.[2] Where an investment consists in whole or in part of debt capital, it is natural to look at the liability side of the balance sheet, and ask whether there is a realistic risk of default if the investment goes sour. Unless the debtor's protection from the risk of default is blatant (e.g., he has obtained mortgage insurance or the debt is nonrecourse), it may be necessary to weigh numerous factors, including guarantees, to determine the reality of such risk. See, e.g.,

---

[2] S. Rept. 94–938, *supra,* 1976–3 C.B. (Vol. 3) at 87, confirms the application of sec. 465(b)(4) to equity capital:

Also, under these rules, a taxpayer's capital is not "at risk" in the business, even as to the *equity* capital which he has contributed[,] to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. * * *

In livestock feeding operations, for example, some commercial feedlots have offered to reimburse investors against any loss sustained on sales of the fed livestock above a stated dollar amount per head. Under such "stop loss" orders, the investor is to be considered "at risk" (for purposes of this provision) only to the extent of the portion of his capital against which he is not entitled to reimbursement. Similarly, in some livestock breeding investments carried on through a limited partnership, the partnership agrees with a limited partner that, at the partner's election, it will repurchase his partnership interest, at a stated minimum dollar amount (usually less than the investor's original capital contribution). In situations of this kind, the partner is to be considered "at risk" only to the extent of the portion of the amount otherwise at risk over and above the guaranteed repurchase price. [Fn. ref. omitted; emphasis added.]

*Thornock v. Commissioner, supra* at 448–449 (to determine whether "other similar arrangements" effectively immunized highly leveraged investors from any realistic possibility of suffering an economic loss, we analyzed "the substance and commercial realities of all material aspects of the transaction."). Such an examination is perfectly appropriate. Nonetheless, in determining a taxpayer's amount at risk, where asset value or investment return is directly protected against loss by a guarantee or other arrangement proscribed by section 465(b)(4), and focusing only on the effect of such guarantee or other arrangement, the character of the taxpayer's investment—whether debt capital or equity capital—can have little (if any) consequence. Thus, in some cases, such as this, a guarantee of asset value or investment return may eliminate the need to consider additional factors, since the guarantee, itself, is sufficient to eliminate all risk of loss with respect to the amount (whether debt financed or equity financed) in question. Indeed, in *Cooper v. Commissioner,* 88 T.C. 84 (1987), we confronted certain lessor-borrowers who were personally liable with regard to purchase money indebtedness incurred to purchase the leased property, but who had options to put that property, which secured their indebtedness, to the lessee at the end of the lease term for amounts approximately equal to the remaining balances of their indebtedness. We said:

These petitioners, through their put options, were protected from economic loss [the risk of default] from the inception of their transactions. * * * Therefore, their obligations under the notes may not be added to their amounts at risk. * * * [*Id.* at 112–113.]

### E. *Rent Guarantees*

The principal financial obligation of a lessee is to pay rent. The financial value of a lease is the present value of the rent stream expected over the unexpired term of the lease. Generally, a guarantee of rent adds to the financial value of a lease. If the guarantee (1) can be relied upon and (2) is unconditional, then the financial value of the lease, together with the value of the guarantee (together, the guaranteed value of the lease), will equal the financial value of a lease to a lessee presenting no risk of lease default. The guarantee shifts the risk of lease default to the guarantor. Because of

the guarantee, the lessor can disregard that risk in determining what his loss might be should the activity in which the leased property is used fail. If the leased property has been purchased with debt capital, and should the activity fail (e.g., because of the lessee's default), then the guarantee assures that the guaranteed value of the lease will be available to repay the indebtedness before any charge need be made to capital. To the extent of the guaranteed value of the lease, the risk of default on the loan has been shifted to the guarantor. To that extent, the guarantee may provide a sufficient basis for us to find that the taxpayer is not at risk with regard to borrowed funds used to purchase the leased property. See sec. 465(b)(4); *Cooper v. Commissioner, supra*; *Capek v. Commissioner,* 86 T.C. 14 (1986).

## F. *Application to the Facts at Hand*

Petitioner was a borrower with regard to the activity here in question. He incurred a purchase money indebtedness to Aardan in connection with his acquisition of an interest in the Associates and C.V. equipment. The long-term note indebted petitioner to pay Aardan the principal amount of $488,750. The long-term note was not due until December 31, 1998. Nevertheless, prepayment was obligatory to the extent of fixed rent payments received from Associates and C.V. Petitioner's indebtedness was secured by (1) his fractional interests in the computer equipment purchased from Aardan and (2) his rights under the agreements leasing that equipment to Associates and C.V. Aardan had the right to collect the rent due petitioner under those agreements. Under the capitalization agreements, subject to certain conditions, Equilease agreed "to make all necessary loans, advances or capital contributions to C.V. and Associates, respectively, to ensure the payment by C.V. and Associates" of rents to petitioner.

A direct benefit to petitioner of the capitalization agreements was that some portion of the risk that Associates and C.V. would default on their obligations to pay rent was shifted from petitioner to Equilease. For reasons that I will make clear shortly, we may assume that Equilease was a reliable guarantor. Nevertheless, Equilease's guarantee was conditional, and we should inquire as to what was the

guaranteed value of the leases to Associates and C.V. To determine how much petitioner was, at any time, at risk on account of the long-term note, we should subtract from the then-remaining principal amount of that note the greater of (1) the guaranteed value of the leases or (2) the nonrecourse portion of petitioner's obligation. Before making those inquiries, however, I will address certain additional arguments made by petitioners on brief as to why the capitalization agreements do not give rise to guarantees encompassed within the language of section 465(b)(4).

### G. *Common Commercial Practice*

On brief, petitioners argue strenuously that Equilease's guarantees of Associates' and C.V.'s rental obligations constituted "a common commercial practice", pursuant to which "it was clearly understood by all that Equilease was standing behind the [lessees]." Petitioners continue:

For all intents and purposes the Tenants-in-Common contracted with the parent Equilease and not the subsidiaries. * * * It makes no sense for a parent's guarantee of its shell subsidiary's lease to be an impermissible guarantee where clearly there would be no violation of the "at risk" rule if the lease had been entered into with the parent directly.

In at least one respect, petitioners undoubtedly are correct. Had the tenants in common done no more than enter into a direct lease with Equilease, the strength of Equilease's credit alone would not have reduced the risk of nonpayment of rent to petitioner, so as to trigger the application of section 465(b)(4). See *Gefen v. Commissioner,* 87 T.C. 1471, 1503 (1986) ("nothing in section 465 * * * requires an owner of property to enter into a transaction with a party that is a poor credit risk in order to be 'at risk' within the meaning of section 465.").

Nevertheless, that is *not* how the present transaction was structured. In deciding the tax consequences of that transaction, we can only consider how the transaction was structured, and not how it might have been. In *Van Roekel v. Commissioner,* T.C. Memo. 1989–74, dismissed and remanded 905 F.2d 80 (5th Cir. 1990), we refused to disregard the separate legal identity of a corporate parent:

Corporate law generally recognizes separate legal identities for the parent corporation and subsidiary, each responsible for its own debts even though

both are part of a single business enterprise. Likewise, jurisdictions widely sanction the parent corporation's guarantee of its subsidiary's obligations, a credit device deemed to be in furtherance of the parent corporation's purposes because of its stock ownership. Thus, for purposes of applying section 465(b)(4), there is no reason for distinguishing a valid guarantee where the guarantor and principal debtor are parent corporation and subsidiary from one where the guarantor and principal debtor are not related. [Citations omitted.]

For the reasons stated in *Van Roekel,* I would not disregard the separate legal identities of Associates and C.V., on the one hand, and Equilease, on the other.

Moreover, nothing in section 465(b)(4) leads me to believe that, because it may be a "common commercial practice" for a parent to guarantee the obligations of a subsidiary, such guarantees are removed from concern under section 465(b)(4). Simply put, I cannot read into section 465(b)(4) a distinction between "bad" and "good" rent guarantees. Financial risk, not motive, is the determinative factor. Section 465 was added to the Code by section 204(a) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1531. In the Senate, S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, accompanied H.R. 10612, 94th Cong., 2d Sess. (1976), which became the Tax Reform Act of 1976. S. Rept. 94–938 simply indicates that insurance against casualties or tort liability is not of a piece with insurance that immunizes an investor from his liability for debt capital contributed to a section 465 activity. S. Rept. 94–938, *supra,* 1976–3 C.B. (Vol. 3) at 88. The principal financial risk associated with the activity petitioner engaged in (leasing) *is* the nonreceipt of rent. Clearly, that is the type of risk that Congress intended an investor to bear in order to be considered at risk with regard to a leasing activity. Finally, petitioners argue that, because no consideration was paid for Equilease's guarantee, Equilease was not an independent third party, on whose credit the tenants in common relied, independent of their reliance on Associates and C.V. (admittedly not superb credit risks). All petitioners are saying, however, is that the deal was priced (rent was determined) as if the lease were with Equilease rather than with Associates and C.V. The short answer to petitioners' claim is that we have decided *not* to engage in that fiction. From an economic point of view, the tenants in common are in the same position that they would have been

had they (1) relied solely on the credit of Associates and C.V. (supposedly Equilease's subsidiaries) in pricing each lease and (2) paid Equilease to bear the risk of nonpayment of rent.[3] Petitioners have advanced no cogent reasons why Equilease's guarantees are not encompassed within the language of section 465(b)(4). Admittedly, I would, in effect, draw a line between lessors who rely solely on the credit of their lessees and lessors who rely in part on the credit of a third party. Cf. *Gefen v. Commissioner, supra.* That distinction, however, merely reflects the line that Congress drew in prohibiting guarantees and similar loss limitations in the first place:

Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for a part or all of any loss by reason of a binding agreement between himself and another person. [S. Rept. 94–938, *supra,* 1976–3 C.B. (Vol. 3) at 87.]

## H. *Value of the Guarantees*

As stated, petitioner agreed to pay $543,750 for his interest in the activity. Petitioner could have lost money if the value of his interest declined below that amount. The amount he could have lost, however, was subject to certain limitations. The long-term note was only partially recourse. The *non*recourse portion was $163,750. Petitioner does not claim that he would have suffered any *additional* loss had the value of his interest in the activity declined (at least initially) below $163,750. Petitioner's potential for loss was, thus (initially), limited to $380,000. That sum ($380,000) is the difference between the amount he had agreed to pay ($543,750) and the nonrecourse portion of the long-term note ($163,750). Put another way, until petitioner had paid down some of the long-term note (reducing the nonrecourse portion), any *further* decline in the value of petitioner's interest in the activity *below* $163,750 would not have increased his potential for loss. The nonrecourse portion of the long-term note was a floor that limited the risk to petitioner of a fall in the value of his interest in the activity. Petitioner may

---

[3] S. Rept. 94–938 indicates that, in such situation, the tenants in common would be in no different at risk position with regard to the guarantee of rental payments (viz, not at risk), but would be able to add to their amount at risk any payments from their own funds made to Equilease for such guarantee. 1976–3 C.B. (Vol. 3) at 88.

have been subject to even less risk, however, because of Equilease's guarantee. Equilease's guarantee may have raised the level of the floor. If the guaranteed value of the leases exceeded $163,750, then the risk petitioner bore would have been less than $380,000. Thus, for instance, if the guaranteed value of the leases were $500,000, petitioner would initially have been at risk only to the extent of $43,750. With regard to determining the guaranteed value of the leases, S. Rept. 94–938 instructs us:

> Similarly, if a taxpayer is personally liable on a mortgage but he separately obtains insurance to compensate him for any payments which he must actually make under such personal liability, the taxpayer is at risk only to the extent of the uninsured portion of the personal liability to which he is exposed.[6] * * *

-------

[6] For purposes of this rule, it will be assumed that a loss-protection guarantee * * * or insurance policy will be *fully* honored and that the amounts due thereunder will be *fully* paid to the taxpayer. *The possibility that the party making the guarantee to the taxpayer * * * will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not * * * material * * *

[S. Rept. 94–938, 1976–3 (Vol. 3) C.B. 49, 88 (emphasis added).]

Thus, we should not concern ourselves with Equilease's financial condition or the possibility that it will not fully honor its guarantee. See *Capek v. Commissioner,* 86 T.C. at 52–53; *Klagsbrun v. Commissioner,* T.C. Memo. 1988–364. Nevertheless, we should not disregard the fact that Equilease's guarantee was conditional. The guarantee was conditional on Aardan's continuing to make payments on its notes to Associates and C.V. Thus, the guaranteed value of the leases was somewhat less than the financial value of leases presenting no risk of lease default.[4] How much less, however, I cannot say.

Petitioners have made the tactical choice to argue that the guarantee is to be disregarded *in its entirety;* that clearly is not the proper course, however. As a result of petitioners' failure of proof, they have left us without guidance as to the guaranteed value of the leases. Lacking sufficient information to make our own estimate, cf. *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930), I would conclude that respondent

-------

[4] I.e., the present value of the rent stream expected over the unexpired term of the lease, assuming a discount rate appropriate for a risk-free lease.

is correct that, for the years in issue, on account of the guarantee, the guaranteed value of the leases was at least $488,750.

On the facts before us, petitioner was protected against a decline below $488,750 in the value of his interest in the activity. Of the $543,750 that petitioner agreed to pay for his interest in the activity, petitioner was at risk only to the extent of his cash contribution ($11,250) and the principal amount of the two short-term notes ($43,750). I would so find. Rule 142(a). Accordingly, I would sustain respondent's determination that petitioner was not at risk during the years in issue with respect to his $488,750 long-term note to Aardan.

CHABOT, *J.*, agrees with this concurring opinion.