T.C. Memo. 1998-19


UNITED STATES TAX COURT


DOUGLAS A. AND JANET VANDER HEIDE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13745-95.                    Filed January 20, 1998.


Douglas A. and Janet Vander Heide, pro sese.

<u>Elizabeth P. Flores</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes:

|  |  | Additions to Tax | | |
|  |  | Sec. | Sec. | Sec. |
| <u>Year</u> | <u>Deficiency</u> | <u>6653(a)(1)(A)</u> | <u>6653(a)(1)(B)</u> | <u>6661(a)</u> |
| 1985 | $11,055 | $552.75 | [1] | $2,763.75 |
| 1986 | 25,573 | 1,278.65 | [1] | 6,393.25 |

[1] 50 percent of the interest due on the deficiency.

Respondent has also determined increased interest under section 6621(c).[1]

The main issues for decision are: (1) Whether petitioners were "protected against loss" within the meaning of section 465(b)(4) with respect to their pro rata share of partnership debt obligations arising from sale-leaseback transactions engaged in by a partnership, and (2) whether additions to tax under sections 6653(a) and 6661(a) and increased interest under section 6621(c) are applicable.

                          FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners both resided in California when they filed the petition in the instant case.

Petitioners timely filed joint Federal income tax returns for the taxable years 1985 and 1986. Petitioners deducted losses and investment interest expenses (the claimed deductions) relating to Hambrose Leasing 1985-4 (the partnership) in the following amounts:

| Year | Loss | Investment Interest |
|------|------|---------------------|
| 1985 | $27,985 | $1,107 |
| 1986 | 45,689 | 14,916 |

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

On May 26, 1995, respondent timely issued two affected item statutory notices of deficiency to petitioners in which respondent disallowed the claimed deductions with respect to the partnership.[2]

This case involves two sale-leaseback transactions among the following entities: the partnership, which engaged in the equipment leasing business; Charterhouse Leasing Associates Limited Partnership (Charterhouse); Hambrose Reserve Ltd. (Hambrose); M&J Holding Corp. (M&J), the sole shareholder of Hambrose and the general partner of Charterhouse; CIS Leasing Corp. (CIS); and Comdisco, Inc. (Comdisco).

The Sale-Leaseback Transactions

The partnership's leasing transaction involves the sale and leaseback of various computer equipment that it purchased in 1985 from Hambrose. Hambrose initially purchased the equipment from Charterhouse. Charterhouse purchased the equipment from CIS and Comdisco, the original purchasers of the equipment. CIS and Comdisco purchased the equipment with financing provided by various third-party lenders and subsequently leased the equipment

---

[2] Although the parties stipulated to the timely filing of the notices, petitioners seem to argue that it is unfair that notice was not given sooner. However, it is clear that respondent complied with the statute and that the notices were timely under sec. 6229(a) and (d) because (1) there was a Final Partnership Administrative Adjustment (FPAA) issued to the partnership, (2) a proceeding was instituted in this Court based on that FPAA, (3) that proceeding was decided on Aug. 3, 1994, and became final on Nov. 1, 1994, and (4) the notices of deficiency were mailed within 1 year thereafter on May 26, 1995.

to various entities.  With respect to the equipment, a wrap lease was executed between Hambrose as lessor and Charterhouse as lessee.  Hambrose assigned the wrap lease to the partnership when the partnership purchased the equipment.  The partnership purchased the equipment subject to all liens created at each stage of the transaction, including the liens of the original third-party lenders, the wrap lease, and all user leases.  At the end of the day, the partnership owned the computers, the operating companies used them, and Charterhouse, Hambrose, and the partnership traded streams of financing payments and lease payments.  The transactions are described in more detail as follows.

The Initial Equipment

CIS initially purchased, subject to financing from third-party lenders, certain IBM computer equipment (the initial equipment), for a total purchase price of $825,150.34.  CIS leased all of the initial equipment to Harrisburg Hospital, Danbury Hospital, and Leeds & Northrup, the actual end users of the equipment.

The Initial Equipment Purchase--Charterhouse

The second purchaser[3] then paid CIS $494,861--$19,794 in cash and the balance represented by nonrecourse installment

---

[3] The "second purchaser" was someone other than Charterhouse.  The "second purchaser" was never identified in the partnership's private offering memorandum (POM).

obligations of Charterhouse secured by the initial equipment--for the initial equipment.

Hambrose Purchase

On or about March 29, 1985, Hambrose purchased the initial equipment from the second purchaser, subject to the liens of the original third-party lenders, the original purchaser, and the user-leases, for $494,861. Hambrose paid the $494,861 as follows: $24,000 in cash and the balance represented by an unsecured note. Concurrently with Hambrose's purchase of the initial equipment from the second purchaser, the second purchaser leased back the initial equipment from Hambrose pursuant to a wrap lease (the initial equipment wrap lease). The terms of the initial equipment wrap lease obligated Charterhouse (by assignment from the second purchaser) to pay four consecutive annual installments beginning March 31, 1986, in the amount of $159,886 in rent. Under the initial equipment wrap lease, the lessee waived "any right of set-off under state or federal law, counterclaim, recoupment, defense or other right which Lessee may have against Lessor or anyone else for any reason whatsoever".

The lease agreement contained the following provision:

18.  Indemnification

18.1 Lessee will indemnify Lessor and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys' fees, wheresoever and howsoever arising which Lessor or its subsidiaries or shareholders, or any of its or their directors, officers, agents, employees, stockholders or partners, may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease or in any way relating to or arising out of this Lease, the Equipment, claims of holders of the Lien or Underlying Leases; * * *

The Initial Equipment Purchase--The Partnership

On or around March 29, 1985, the partnership purchased the initial equipment from Hambrose for $494,861 subject to all liens of the third-party lenders and Hambrose, the user leases, and the initial equipment wrap lease.  The partnership paid for the initial equipment as follows:  $1,000 cash on the closing in November 1985, $28,000 cash by December 31, 1985, and $465,861 represented by a note (the partnership note) secured by the initial equipment payable in four consecutive annual installments of $159,886 with the first installment due on March 31, 1986. The partnership note contained the following provision (hereinafter the deferral provision):

5.1  Deferral.  Maker [the Partnership] shall have the right to defer payment of the Principal Amount and interest as the same becomes due under this Note if and to the extent any amount of rent or other sums due to Maker under an agreement of even date (the "Lease"), between Charterhouse Equipment Associates Limited Partnership ("Charterhouse"), as lessee, and Maker, as lessor is not received by Maker as the same becomes due

(the "Past Due Sum"). The amount of principal and interest so deferred will become due and payable at such time as, and to the extent that, Maker receives from Charterhouse the Past Due Sum; provided, however, that no interest shall accrue on the principal and interest payments so deferred; provided, further, however, that the amount of interest and principal so deferred shall become due and payable on Jan. 1, 1992; whether or not Maker shall have received the Past Due Sum on or before such date.

In conjunction with the partnership's purchase of the initial equipment, Hambrose assigned the initial equipment wrap lease to the partnership.

## Additional Equipment

CIS and Comdisco purchased additional IBM equipment (the additional equipment). They financed the purchase of the additional equipment, amounting to $15,175,231, through eight different third-party lenders. All of the additional equipment was leased by CIS and Comdisco to eight actual end users of the equipment.

### Charterhouse Purchase

The second purchaser acquired the additional equipment from CIS and Comdisco in two separate purchase transactions. All rights and obligations under these transactions were subsequently assigned to Charterhouse. The second purchaser paid, in the aggregate, cash of $1,004,538 and installment notes totaling

$11,089,447.  According to the POM, these notes were nonrecourse obligations of Charterhouse.

Hambrose Purchase

Hambrose purchased the additional equipment from Charterhouse for $11,064,696, subject to all other liens and leases including the liens of the original third-party lenders, CIS and Comdisco, and user leases.  Hambrose paid for the additional equipment as follows:  $1,200,000 in cash and a $9,864,696 installment note.  This note was unsecured and payable in seven annual installments, the first, in 1986, of $206,473 and the remaining six installments of $2,477,681.  Concurrently with Hambrose's purchase of the additional equipment from Charterhouse, Charterhouse leased back the additional equipment from Hambrose pursuant to a wrap lease (the additional equipment wrap lease).  The additional equipment wrap lease called for the following annual fixed rental payments:

| Year | Unit Minimum | Unit Maximum |
|------|-------------|-------------|
| 1985 | $0 | $0 |
| 1986 | 206,473 | 413,091 |
| 1987 | 2,477,681 | 4,957,116 |
| 1988 | 2,477,681 | 4,957,116 |
| 1989 | 2,477,681 | 4,957,116 |
| 1990 | 2,477,681 | 4,957,116 |
| 1991 | 2,477,681 | 4,957,116 |
| 1992 | 2,477,681 | 4,957,116 |

Partnership Purchase

The partnership purchased the additional equipment from Hambrose for $11,064,696 subject to all other liens and leases including those of the original third-party lenders, the original

purchasers, and Hambrose.  The partnership paid for the additional equipment as follows:  $1,106,470 in cash and a $9,958,226 installment note secured by the additional equipment. The note was payable in eight installments with the first installment of $644,530 due at closing.  Thereafter, the payments were as follows:

| Year | Amount |
|------|--------|
| 1986 | $206,473 |
| 1987 | 2,477,681 |
| 1988 | 2,477,681 |
| 1989 | 2,477,681 |
| 1990 | 2,477,681 |
| 1991 | 2,477,681 |
| 1992 | 2,477,681 |

This note contained a deferral provision similar to the one discussed, supra, for the note used to purchase the initial equipment.  Hambrose assigned the additional equipment wrap lease to the partnership pursuant to its purchase of the additional equipment.

The partnership's purchases of the initial equipment and the additional equipment were subject to all liens created at each stage of the transaction, including the liens of the original third-party lenders, the wrap lease, and all user leases.

The Partnership

Investments in the partnership were offered through a POM. The partnership offered 100 units of partnership interests at a price of $40,000 each, payable in full in cash or in the amount of $8,500 in cash and two $15,750 notes bearing 12-percent

interest, one payable on February 3, 1986, and the other on February 2, 1987.

As a condition of becoming a limited partner, the partnership required an investor to assume recourse debt of $114,805 per partnership unit purchased, which represented his or her proportionate share of the note executed by the partnership in connection with the purchase of the additional equipment. The partnership anticipated that the obligation assumed by the limited partners pertained to the last installments of the partnership note, due between January 1, 1990, and January 1, 1992.

The POM included the following projection of tax benefits per partnership unit for the first years of the transaction:

| | | 50 Unit Minimum | | 100 Unit Maximum | |
|---|---|---|---|---|---|
| Year | Investment | Projected Tax Loss | Loss as a Percent of Investment | Projected Tax Loss | Loss as a Percent of Investment |
| 1985 | $8,500 | $30,170 | 355 | $30,173 | 355 |
| 1986 | [1]15,750 | 47,223 | 300 | 47,378 | 301 |
| 1987 | [1]15,750 | 45,247 | 287 | 45,539 | 289 |
| 1988 | -0- | 18,437 | | 18,868 | |
| 1989 | -0- | 13,728 | | 12,847 | |
| Total | 40,000 | 154,805 | 387 | 154,805 | 387 |

[1] Does not include interest at 12 percent per annum.

## Petitioner's[4] Decision to Invest

On or about November 21, 1985, petitioner executed subscription documents to purchase one unit in the partnership,

---

[4] References to petitioner in the singular refer to Douglas A. Vander Heide.

for which he paid a total of $40,000 in cash. The amount of recourse debt which petitioner assumed totaled $114,805.

Prior to investing in the partnership, petitioner had never invested in an equipment leasing transaction. Petitioner spoke to his accountant, Joseph R. Levin, three times about his investment in the partnership. Petitioner never spoke to Barry Goldwater, Jr., the general partner of the partnership, Herman Finesod, the chairman of the board of Hambrose Reserve, or James Harber or Ron Finerty, the other officers of Hambrose Reserve, about this investment. Petitioner received the subscription documents on November 21, 1985, the day he signed them.

Petitioner understood that the rents from Charterhouse would be used to offset debt payments to Hambrose. He was not concerned about the end-users because they were big companies. Petitioner understood that the partnership's promissory note on which he assumed personal liability would be paid in 1992. The partnership never asked petitioner for additional contributions.

Petitioner knew that the investment would create tax losses, and he had seen a schedule of projected tax losses for each taxable year. Petitioner expected the investment to yield phantom income in the third or fourth year. Petitioner knew that phantom income is not an actual cash distribution.

## OPINION

### At-Risk

We must now decide whether petitioners were at risk for their assumed liability in the context of the sale-leaseback

transactions. Because respondent first raised the at-risk issue in the answer, respondent bears the burden of proof and so concedes on brief.

Section 465(a) provides that deductions with respect to the type of leasing activity represented by this case are only allowable to the extent of the amount for which the taxpayer is at risk. Generally, a taxpayer will, subject to the exception in section 465(b)(4), discussed below, be considered at risk for the amount of any cash investment. Sec. 465(b)(1)(A). Also, a taxpayer will be considered at risk for the amounts borrowed with respect to the activity, to the extent that the taxpayer is personally liable for the repayment of such amounts. Sec. 465(b)(2)(A).

Respondent concedes that the partnership's transactions had a business purpose with economic substance, were engaged in for profit, and that the partnership's equipment was correctly valued. Respondent also concedes that petitioners were at risk in the amount of their $40,000 cash investment. Nevertheless, respondent contends that petitioners were not at risk for the amount of assumed partnership debt under section 465(b)(4) which provides:

>     (4) Exception.--Notwithstanding any other
> provision of this section, a taxpayer shall not be
> considered at risk with respect to amounts protected
> against loss through nonrecourse financing, guarantees,
> stop loss agreements, or other similar arrangements.

Respondent does not contend that petitioners were protected by guaranties or stop loss agreements, but rather by nonrecourse financing and "other similar arrangements".

When analyzing a transaction under section 465(b)(4), we use the "realistic possibility" or "economic reality" test set forth in American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990) (sometimes cited as Baldwin v. United States), and approved by this Court in Levien v. Commissioner, 103 T.C. 120, 126 (1994), affd. without published opinion 77 F.3d 497 (11th Cir. 1996).

This test asks "whether there is any realistic possibility that the taxpayer ultimately will be subject to economic loss on the investment at issue." Levien v. Commissioner, supra at 126. In applying this standard, we are guided by the substance of the transaction, not its form. Id. at 129. We look not to any single factor, id. at 127, but to whether the combination of factors and characteristics of the transaction rises to the level of an "other similar arrangement" with the effect of protecting petitioners against risk.

Unfortunately in this case, both parties have had to deal with a lack of documentation. We find, however, no significant difference between the facts of this case and those of Estate of Bradley v. Commissioner, T.C. Memo. 1997-341 (concerning a partner in the Hambrose Leasing 1984-5 partnership).

Respondent first stresses the circular nature of the payments--the partnership's debt payments to Hambrose were exactly offset by the rental payments it received from Charterhouse. This circularity is set forth in the stipulation of facts as well as the POM. As we have previously held, circular payments do not per se constitute "other similar arrangements" for purposes of section 465(b)(4). Krause v. Commissioner, 92 T.C. 1003, 1024 (1989). Nevertheless, they are a factor to be considered. Levien v. Commissioner, supra at 126.

Not only were the debt and rental payments matching in amount and timing, but the flow of payments was circular. It would thus appear to make no difference whether the parties made the payments or not, so long as each of the parties in the circle did the same thing. The circularity of the payments, when combined with the common ownership of Charterhouse and Hambrose, provides little economic incentive for Hambrose to pursue the limited partners for their share of the debt in the event of a default.

Respondent also contends that the deferral provisions operated to protect petitioner against loss. The sale or re-leasing of the equipment at the end of the transactions, which could have provided funds to satisfy deferred liabilities, was viewed as a significant source of return on investment. It is clear that debt obligations payable in the future are included in the amount for which a partner is considered personally liable

for purposes of section 465(b)(2).  <u>Melvin v. Commissioner</u>, 88 T.C. 63, 73 (1987), affd. 894 F.2d 1072 (9th Cir. 1990).  Thus, we cannot simultaneously propose a rule that the deferral of debt obligations into the future represents per se an "other similar arrangement" for section 465(b)(4).  The presence of deferral provisions, however, is another factor to be considered in deciding whether a taxpayer is protected against loss.  See <u>Santulli v. Commissioner</u>, T.C. Memo. 1995-458.

The instant transaction is similar to the equipment leasing transaction in <u>Hayes v. Commissioner</u>, T.C. Memo. 1995-151.  <u>Hayes</u> involved sale-leaseback transactions by and between the Hambrose Leasing-5 Partnership, Charterhouse, and Hambrose Reserve.  As in the instant case, <u>Hayes</u> involved circularity of payments and that partnership's deferral provisions.  Applying the realistic probability test in <u>Hayes</u>, we held that the taxpayers were not at risk under section 465(b)(4).  We stated the following:

> Moreover, there were co-extensive provisions for delaying the rental payments and the payment of the purchase price installments for the years 1987 through 1990.  Furthermore, the responsibility of M & J, as the general partner of Charterhouse, for the rent payments provided an important assurance that the rents, which would be the source of the payments by the partnership to Hambrose Reserve, would be paid.  <u>Id.</u>

The ultimate decision whether the taxpayer is protected against loss "rests upon the substance of the transactions in light of all the facts and circumstances."  <u>Wag-A-Bag, Inc. v. Commissioner</u>, T.C. Memo. 1992-581.

We think the circularity of payments, the deferral provisions, and the similarity of ownership among the entities, when taken together, are sufficient to satisfy respondent's burden that petitioner, while nominally "personally liable" for the assumed liabilities under section 465(b)(2), effectively was immunized from any realistic possibility of suffering an economic loss under section 465(b)(4), was not at risk, and is not entitled to the deductions in question. Levien v. Commissioner, supra at 120. We so hold.

Additions

Section 6621(c)

Respondent seeks increased interest pursuant to section 6621(c). That section provides for an increase in the interest rate to 120 percent of the statutory rate on underpayments of tax if a substantial understatement is due to a tax-motivated transaction. Certain transactions are deemed to be "tax motivated" by section 6621(c)(3), including any loss disallowed under section 465(a). Sec. 6621(c)(3)(A)(ii).

Since we have concluded that the loss deductions in issue are disallowed under section 465(a), it follows that the activities were tax motivated under section 6621(c)(3). We therefore sustain respondent on this issue.

Section 6653(a) (Negligence)

Respondent has determined an addition to tax under section 6653(a) for negligence. Section 6653(a)(1) (section

6653(a)(1)(A) for 1986) provides that if any part of any underpayment of tax is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment.  Section 6653(a)(2) (section 6653(a)(1)(B) for 1986) provides for an addition to tax in the amount of 50 percent of the interest payable on the portion of the underpayment of tax attributable to negligence.

Negligence is defined as the lack of due care or failure to do what an ordinarily prudent person would do under the circumstances.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).  Negligence also includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws.  Sec. 6653(a)(3). Petitioner bears the burden of proving that respondent's determinations are in error.  Rule 142(a).

Reasonable and good faith reliance on the advice of an accountant or attorney may offer relief from the imposition of the negligence addition.  United States v. Boyle, 469 U.S. 241, 250-251 (1985).  Reliance on professional advice, however, is not an absolute defense to negligence, but rather a factor to be considered.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Petitioner initially received the POM from his accountant, Joseph R. Levin.  Additionally, petitioner had three conversations with Mr. Levin about the partnership.  Mr. Levin

prepared petitioners' joint Federal income tax return for the 1985 tax year. Additionally, petitioners had John P. Schneider, a certified public accountant, prepare their joint Federal income tax return for the 1986 tax year. We also note that at the time petitioners made their investment, as our subsequent discussion in respect of the addition to tax under section 6661 reveals, most of the pertinent decisions had not been handed down so that there was at best a shortage of authority setting forth legal principles governing the tax consequences arising from the at-risk provisions of section 465.[5]

We think the foregoing circumstances meet the standard established in United States v. Boyle, supra at 251, where the Supreme Court stated: "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice."

We conclude that petitioners made a reasonable effort to obtain, and in fact received, appropriate advice in respect of petitioner's investment, and therefore they were not negligent within the meaning of section 6653(a).

Section 6661(a) (Substantial Understatement)

Respondent has asserted additions to tax under section 6661(a) for substantial understatement.

---

[5] See discussion in Andrews v. Commissioner, T.C. Memo. 1985-380 (no negligence under sec. 6653(a) because the fact that a type of transaction was disapproved by courts not clear at the time taxpayers entered into transaction).

In this case, resolution of the at-risk issue is based partly on a conclusion drawn from complex and interrelated contractual documents.  See Waters v. Commissioner, T.C. Memo. 1991-462, affd. 978 F.2d 1310 (2d Cir. 1992).  The facts of this case are similar to the facts of a number of other cases in which taxpayers prevailed and were found by this Court to be at risk with respect to sale-leaseback transactions.  See, e.g., Levy v. Commissioner, 91 T.C. 838 (1988); Gefen v. Commissioner, 87 T.C. 1471 (1986); Brady v. Commissioner, T.C. Memo. 1990-626; Emershaw v. Commissioner, T.C. Memo. 1990-246, affd. 949 F.2d 841 (6th Cir. 1991).  We have also found that many similarly situated taxpayers, who did not prevail and were found to be not at risk, nevertheless had substantial authority for positions taken on their returns.  See Estate of Bradley v. Commissioner, T.C. Memo. 1997-341; Waters v. Commissioner, supra; Epsten v. Commissioner, T.C. Memo. 1991-252; Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990); B & A Distrib. Co. v. Commissioner, T.C. Memo. 1988-589.

On the facts of this case, with regard to the at-risk issue, we find that there existed substantial authority for petitioners' return position.  We therefore hold that petitioners are not liable for the section 6661 additions to tax.

To reflect the foregoing,

Decision will be

entered under Rule 155.