JOHN H. HAYES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN H. AND BONNIE D. HAYES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hayes v. Commissioner
Docket Nos. 14717-93, 14953-93
United States Tax Court
T.C. Memo 1995-151; 1995 Tax Ct. Memo LEXIS 138; 69 T.C.M. (CCH) 2323; April 4, 1995, Filed *138 Decisions will be entered under Rule 155. For petitioners: David L. Watson. For respondent: Elizabeth P. Flores. TANNENWALD
TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
Docket No. 14717-93
1984
$ 17,219
Docket No. 14953-93
1985
17,026
1986
13,379
In respect of each deficiency, respondent determined that, because of a substantial underpayment attributable to tax-motivated transactions, additional interest was due under section 6621. [1] The principal issue for decision is whether petitioner John H. Hayes (Hayes) was "at risk" within the meaning of section 465(b); the section 6621 additional interest turns upon our decision on the "at risk" issue. This case was submitted fully stipulated. The stipulation of facts and the *139 accompanying exhibits are incorporated herein by reference. Petitioners resided in Dunwoody, Georgia, at the time the petitions were filed. They timely filed their Federal income tax returns for the years in question with the Internal Revenue Service Center, Atlanta, Georgia. In 1983, Hambrose Leasing-5 (hereinafter the partnership) offered between 52 and 125 partnership units pursuant to a private placement memorandum and accompanying exhibits the text of which have been stipulated. On or about December 23, 1983, Hayes became a limited partner in the partnership by executing a subscription agreement and a limited partnership agreement. He owned a single unit partnership interest acquired by a cash payment of $ 6,000 and the execution of three negotiable promissory notes each in the amount of $ 13,400 with interest at 10 percent per annum. Hayes paid the principal and interest on the due dates as follows: Note Due
Date
Principal
Interest
Total
6/1/84
$ 13,400.00
$   595.56
$ 13,995.56
6/1/85
13,400.00
1,969.06
15,369.06
6/1/86
13,400.00
3,327.66
16,727.66
In addition to these cash payments, under the limited partnership agreement and the subscription *140 agreement, Hayes assumed personal liability for an amount (specified to be $ 104,999) representing approximately two-thirds of the principal and interest of his proportionate share of the partnership note to Hambrose Reserve Ltd. (Hambrose Reserve) which assumption gave Hambrose Reserve the right to pursue Hayes directly in respect of his assumed share. [2] The assumption liability of the partners was several and not joint. The transactions involved herein consist of purchases and leases of computer equipment (hereinafter "the equipment"), of which the partnership's purchase was the last transaction. The equipment was originally purchased by Comdisco, Inc. (Comdisco), with funds borrowed from third-party lenders and leased by Comdisco as reflected in the following table: Third-Party Lender
Amount
Lessees
The Rochester
Caterpillar
Community Savings
$ 2,692,855.73
Tractor Co.
Bank
Aid Association
for Lutherans
4,413,571.00
Merck & Co.
The Great-West
Warner Bros.,
Life Assurance
2,183,099.00
Inc.
Company
County Bank of
Beverly
St. Louis
1,812,297.87
Enterprises
Goldome FSB
1,941,300.44
General Motors
Corp. *141 The notes furnished by Comdisco to the third-party lenders were nonrecourse. [3] They were secured by the equipment and an assignment of net rents under the leases. The amounts of borrowings set forth above represented the discounted value of the aggregate net rentals payable under the leases. *142 The parties have stipulated that, due to the unavailability of much of the documentation as to the transactions involved herein, the figures contained in the stipulated private placement memorandum should be used for the legal analysis involved herein. Accordingly, the figures hereinafter set forth are taken from that memorandum, except where the context indicates otherwise. Moreover, in this connection, petitioners state on brief, and respondent does not disagree, that although more than 52 units were sold by the partnership, the sale of such additional units merely increased all projections proportionately. The parties have argued their positions herein on the premise that 52 units were sold and the explanations based thereon as reflected in the private placement memorandum. Our views herein are likewise based on the same premise and explanations. Charterhouse Leasing Associates (Charterhouse) was a limited partnership, of which M & J Holding Corporation (M & J) was the general partner. Charterhouse purchased the equipment from Comdisco for $ 8,997,273 of which $ 8,897,180 represented the equipment purchase price, and the balance of $ 100,093 represented the price paid for *143 the assignments of the user leases. Of the $ 8,897,180 equipment purchase price, $ 671,160 was to be paid in cash within 120 days of purchase and the balance of $ 8,226,020 by assumption of the notes executed by Comdisco and payable to the above third-party lenders with respect to Comdisco's initial purchase of the equipment. Comdisco retained a purchase money security interest in the equipment to the extent of the cash portion of the purchase price remaining unpaid to it at closing, an aggregate of $ 548,824. Such unpaid cash portion of the purchase price was due and payable with 11-percent interest on November 30, 1983, except that Charterhouse had the option to extend such date to December 30, 1983, by partial payment on November 30, 1983. According to the private placement memorandum, "In addition to the security interests of Comdisco in the Equipment, as further security for the payment of such unpaid cash portion of the purchase price, M & J guaranteed each note payment to Comdisco." M & J had an unaudited net worth in excess of $ 20 million. On or about November 30, 1983, Hambrose Reserve, of which M & J was the sole shareholder, purchased the equipment from Charterhouse *144 for $ 8,897,180, subject to the liens of the original third-party lenders, and the user leases. The purchase price for the equipment was to be paid as follows: a. $ 1,128,690 cash on or about November 30, 1983, and b. $ 7,768,490 by an installment note bearing 13.052 percent interest. This note was unsecured and was payable in nine installments, with the first installment of $ 20,480 due at closing. The other installments (including interest) were payable as follows: Due Date
Amount 1/1/84
$   776,375
1/1/85
776,375
1/1/86
776,375
1/1/87
1,275,911
1/1/88
1,275,911
1/1/89
1,275,911
1/1/90
1,275,911
1/1/91
5,827,654
Concurrently with Hambrose Reserve's purchase of the equipment from Charterhouse, Charterhouse leased back the equipment from Hambrose Reserve pursuant to a wrap lease. Based upon 52 partnership units, the rentals under the wrap lease were specified as follows: Annual Rental Annual Rental Plus Interest
Years (No deferral) [4]
(Deferral) 1983
$    20,480
$    20,480
1984-
1986
776,375
776,375
1987-
1990
2,225,995
1,275,911
1991
741,998
5,827,654
*145 The wrap lease provided that the lessee's obligation to pay all rental charges was "absolute and unconditional" and that the "Lessee hereby waives any right of set-off under state or federal law, counterclaim, recoupment, defense or other right which Lessee may have against Lessor or anyone else for any reason whatsoever". As the general partner of Charterhouse, M & J was responsible for the wrap lease obligations. [5]
According to the private placement memorandum, on or about November 30, 1983, the partnership was to purchase the equipment from Hambrose *146 Reserve for $ 8,897,180 subject to all liens of the third-party lenders, Comdisco, Hambrose Reserve and Charterhouse and subject to the user leases and the equipment wrap lease. The partnership was to pay for the equipment as follows: a. $ 889,718 cash, and b. $ 8,007,462 by an installment note, secured by the equipment. This note was payable in nine installments with the first installment of $ 186,840 due at closing and was secured by a lien and security interest in and to the equipment. The other installments (including interest) were due as follows: Due Date
Amounts
1/1/84
$ 1,121,045 ($ 776,375) *
1/1/85
1,121,045 ($ 776,375) *
1/1/86
1,121,045 ($ 776,375) *
1/1/87
1,275,911
1/1/88
1,275,911
1/1/89
1,275,911
1/1/90
1,275,911
1/1/91
5,827,654
* At closing, the partnership was required to
prepay $ 1,034,010 against the first three installments
which would reduce the annual payment for 1984, 1985,
and 1986 to $ 776,375 each year.
The partnership paid the noncash portion of the purchase price by means of a note entitled "Limited Recourse Installment Promissory Note -- Security Agreement", dated December 31, 1983. [6]
*147 The installment note provided for the previously described assumption of liability by the limited partners and further provided that the obligation thereunder and that of the partners in respect of the "assumed personal liability" was "absolute and unconditional under all circumstances" and that the purchaser waived any "right of set-off under state or federal law, counterclaim, recoupment, defense or other right which the Purchaser may have against the Seller or anyone else for any reason whatsoever". The note also provided that the partnership would be able to defer payments due to the extent that Charterhouse deferred the payment of rent under the wrap lease, see supra note 6, but payments so deferred would be due and payable on May 31, 1991, irrespective of whether Charterhouse paid the deferred rentals. Petitioners have the burden of proof on all issues involved herein. Rule 142(a). See also infra p. 14 We begin our analysis with two preliminary observations: (1) We have had to struggle with an incomplete record, which, according to the parties, is due to the unavailability of documentation and (2) our task has been complicated by the failure of the parties, in *148 setting forth their positions fully, to reflect facts disclosed by the record. See infra pp. 12-13; see also supra notes 2, 3, 5. Initially, we must decide whether Hayes was "personally liable", within the meaning of section 465(b)(2)(A), [7] *150 beyond his cash investment in the partnership in respect of his assumption of his proportionate share ($ 104,999) of the unpaid purchase price of the equipment purchased by the partnership from Hambrose Reserve. As the foundation of their positions on this issue, the parties have locked horns on whether the obligation of the partnership to Hambrose Reserve was recourse or nonrecourse. Respondent relies on the concession as to the nonrecourse character of the obligation which was allegedly made in Hambrose Leasing-5 Limited Partnership v. Commissioner, docket No. 16265-92, at the time a petition against three notices of final partnership administrative adjustments, filed by the tax matters partner, was dismissed by this Court for lack of jurisdiction as to the applicability of the at-risk provisions of section 465(b)(4), a concession which is confirmed by the stipulation herein, and to a further alleged concession to the same effect *149 during an earlier proceeding in this case. Petitioners argue that they should not be bound by the concession relied upon by respondent but do not seriously contend that the partnership obligation was recourse; they simply assert, however that obligation is characterized, the assumption of that obligation by Hayes created a recourse liability on his part. Although petitioners appear to concede on brief that the partnership's obligation to Hambrose Reserve was nonrecourse, we find it unnecessary definitively to resolve the issue as to the proper characterization of that obligation for the purpose of applying section 465(b)(2)(A) because we are satisfied that the nature of Hayes' liability by way of his assumption does not depend upon whether the partnership's obligation was recourse or nonrecourse. [8]
Respondent, assuming that her position as to the nonrecourse characterization of the partnership's obligation to Hambrose Reserve is correct, argues that Hayes' assumption of liability was subject to the same characterization, because an assumption of a nonrecourse liability is itself nonrecourse so that Hayes was not "personally liable" within the meaning of section 465(b)(2)(A). Respondent's position in this regard is without merit. In the first place, it produces the absurd situation that the creditor's position is not enhanced one iota by the assumption, making the assumption an exercise in futility. In the second *151 place, respondent's position has been rejected by Abramson v. Commissioner, 86 T.C. 360, 374-376 (1986), where a partner was held to be at risk with respect to his guaranty of a share of a partnership nonrecourse obligation. Respondent's distinction, based upon the suggestion of a difference between a guaranty and an assumption, is a distinction without a difference, particularly since the assumption herein specifically stated that it could be enforced directly against Hayes by Hambrose Reserve. See supra pp. 3-4. Cf. Follender v. Commissioner, 89 T.C. 943, 949 (1987). We hold that Hayes' assumption obligation satisfies the requirements of section 465(b)(2)(A). We now turn to the issue as to whether Hayes was protected against loss and therefore not "at risk" within the meaning of section 465(b)(4) which provides: (4) Exception. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.
In applying this section, "we look to *152 see whether there is any realistic possibility that the taxpayer ultimately will be subject to economic loss". Levien v. Commissioner, 103 T.C. 120, 126 (1994), on appeal (11th Cir. Dec. 29, 1994). Our search is based upon a standard of economic reality. Id. at 128-129; see also Young v. Commissioner, 926 F.2d 1083, 1088, 1089 n.14 (11th Cir. 1991), affg. T.C. Memo. 1988-440, the circuit to which an appeal herein lies, and Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The question is factual, and petitioners have the burden of proof. Levien v. Commissioner, supra at 126. That burden is not affected by the fact that the case is fully stipulated. Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. on other issues 943 F.2d 22 (8th Cir. 1991). In this connection, we reject petitioners' contention that, because section 465(b)(4) is an exception, the burden of proof as *153 to its application is upon respondent. We know of no principle that carves out substantive statutory exceptions from the general rule as to burden of proof, and petitioners have not cited any authority, nor are we aware of any, for their assertion. In determining the economic reality of leasing transactions such as are involved herein, we focus: in particular upon the relationships between the parties, whether the underlying debt is nonrecourse, the presence of offsetting payments and bookkeeping entries, the circularity of the transaction, and the presence of any payment guarantees or indemnities. * * * [Levien v. Commissioner, 103 T.C. at 126.]
Because of the thrust of petitioners' arguments, we find it unnecessary to deal further with the issue of recourse versus nonrecourse obligations. See supra note 3; pp. 12-13, particularly note 8. As to the relationship of the parties, respondent has not suggested that any inhibiting connections existed, and, as far as the record discloses, there appears to have been none. We see no need to review the various cases dealing with the other factors, which reflect varying degrees of differences *154 in analysis and conclusion. Such a review has recently been articulated in Levien v. Commissioner, supra, and particularly in Judge Halpern's concurring opinion, 103 T.C. at 130-140. [9] Rather, we will direct our attention to those elements of the transactions involved herein upon which petitioners rely to avoid the impact of decisions such as Levien v. Commissioner, supra, and Young v. Commissioner, supra.
Petitioners first urge us to adopt the "worst case" standard articulated in Emershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246, and Matuccio v. Commissioner, 30 F.3d 743 (6th Cir. 1994), revg. and remanding T.C. Memo. 1992-311. We have expressly *155 rejected that standard in favor of the "economic reality" standard. Levien v. Commissioner, supra at 128-129. Petitioners next argue that they should prevail even under the "economic reality" standard, because of the waivers of the right of offset and alleged differences in the amounts to be paid and received by the various parties, notably between the partnership and Hambrose Reserve. We think petitioners' reliance on the waivers of rights of offset by Charterhouse under the wrap lease, and by the partnership under its purchase agreement with Hambrose Reserve, is misplaced. To be sure, these waivers create an aura of absoluteness in respect of the obligations involved, but it does not appear that the waivers extended to foregoing claims for the amounts involved. Thus, it may be that cross-suits could have been brought which could have produced offsets, albeit not by bookkeeping as such but by way of nonpayment in fact. Moreover, there were co-extensive provisions for delaying the rental payments and the payment of the purchase price installments for the years 1987 through 1990. Furthermore, the responsibility of M & J, as the general partner *156 of Charterhouse, for the rent payments provided an important assurance that the rents, which would be the source of the payments by the partnership to Hambrose Reserve, would be paid. With respect to the claimed difference between the amounts payable by Charterhouse under the wrap lease and by the partnership, such difference is more apparent than real. The apparent difference involves the fact that the scheduled payments on the partnership note for 1984, 1985, and 1986 do not reflect the required prepayment. If that prepayment is applied, there is an identity of rent and installment payments [10] for all years. See supra pp. 8 and 9. Petitioners make the further argument that Hayes would be liable if Charterhouse did not exercise its right of deferral of rent payments because, in these circumstances, the rent payments would substantially exceed the payments on the partnership note and could have been distributed to the partners during what would otherwise have been the deferral years, leaving the partnership without sufficient funds to make the payments on the note in the later years. This assertion seems to us to be nothing more than an attempt by petitioners to pull themselves *157 up by their bootstraps and is, to say the least, disingenuous. Similarly, we are not impressed with petitioners' argument based upon the differences in the various time periods covered by the leases and the final due dates of the note obligations. These differences are insufficient to be a significant factor to be taken into account. The long and short of the matter is that the differences which petitioners claim distinguish this case from other cases applying the "economic reality" standard are simply window dressing. See Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990). Accordingly, we think the instant case falls within the ambit of Young v. Commissioner, supra, and Levien v. Commissioner, supra.At *158 the very least, the evidence of record is not sufficient for us to conclude that petitioners have carried their burden of proof (which petitioners erroneously assert was on respondent, see supra p. 14) that these cases are not dispositive. We hold that Hayes was not "at risk" during the years at issue within the meaning of section 465(b)(4) in respect of his assumption of liability for his pro rata share of the partnership note. As far as the additional interest under section 6621 is concerned, petitioners have advanced no circumstances, other than those involved in the at risk issue, which would cause them not to be liable for the additional interest under section 6621. Accordingly, we sustain respondent on this issue. To reflect the foregoing and respondent's concession in respect of Hayes' cash investment, see supra note 7, Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent's criticism of petitioners' use of the subscription agreement on brief, because it is not part of the record, is incorrect.↩
3. Petitioners contend that the notes were recourse because liability on the notes was not qualified on their face. Petitioners are in error. The note to The Rochester Community Savings Bank specifies that "the Borrower has and shall have no personal liability or obligation with respect to payment of this Note * * * and * * * this Note * * * is payable solely from the proceeds * * * from * * * the Collateral". The note to The Great-West Life Assurance Company states "The liability of the Borrower with respect to this Secured Promissory Note and the Loan Agreement is limited as provided in Section 5 of the Loan Agreement". This language is consistent with a nonrecourse liability. Given the fact that petitioners have the burden of proof (see infra↩ p. 14) and the fact that we have not been provided with the loan agreement, we see no reason to conclude otherwise. We take the same view in respect of the rights of the other lenders with respect to whom we have not been furnished with any documentation.
4. The wrap lease permitted Charterhouse to defer until 1991 rent payments due in 1987 through 1990 in excess of $ 3,067,163 (if 125 partnership units were sold) or in excess of $ 1,275,911 (if 52 units were sold).↩
5. Respondent claims that M & J guaranteed the rent -- a characterization to which petitioners object on the ground that the private placement memorandum reflected no such guaranty. We think that, while technically not a guaranty, M & J's obligation is the substantive equivalent. We note that M & J's responsibility as the general partner of Charterhouse is reflected in the summary of the transactions involved herein, attached to the private placement memorandum.↩
6. The partnership actually purchased the equipment for $ 14,324,660 payable $ 1,432,466 cash and the balance with a note in the amount of $ 12,892,194 plus interest. The cash payment and the installment payments, which included interest, are different from the amounts set forth in the private placement memorandum. See supra↩ note 5.
7. Respondent concedes that the partnership leasing transactions involved herein had economic substance, and were engaged in for profit and that the partnership equipment was properly valued. Respondent also concedes that Hayes was at risk to the extent of his $ 46,200 cash investment in the partnership.↩
8. In fact, the partnership note was part recourse and part nonrecourse. The note itself is labeled "Limited Recourse Installment Promissory Note", and paragraph 10 provides that only the obligation to pay principal and interest due prior to Jan. 1, 1991, shall be considered nonrecourse. The partnership note also provided that all payments were first to be applied to the portion of the principal and interest for which no partner had personal liability. See supra↩ pp. 3-4.
9. See also Wag-A-Bag, Inc. v. Commissioner, T.C. Memo. 1992-581↩.
10. This identity is based on the assumption, shared by the parties herein, that Charterhouse would exercise its right of deferral. See supra↩ note 4.