T.C. Memo. 1997-341


UNITED STATES TAX COURT


ESTATE OF JACK L. BRADLEY, DECEASED, JOHN S. BRADLEY,
SUCCESSOR EXECUTOR, C.T.A., Petitioner v. COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket No. 16637-95.                     Filed July 28, 1997.


Mark E. Kellogg and William F. Krebs, for petitioner.

Elizabeth P. Flores and Steven M. Roth, for respondent.



MEMORANDUM OPINION

TANNENWALD, Judge:  Respondent determined the following
deficiencies and additions to tax in Jack L. Bradley's
(decedent's) Federal income taxes:

| Year | Deficiency | Additions to Tax Under Secs. 6653(a)(1)(A) | 6653(a)(1)(B) | 6661 |
|------|-----------|---------------|---------------|------|
| 1982 | $134,733.00 | $6,736.65 | [1] | $33,683.25 |
| 1983 | 176,099.00 | 8,804.95 | [1] | 44,024.75 |

[1] 50 percent of the interest due on the deficiency.

Respondent has also determined increased interest under section 6621(c).[1]

The main issues for decision are: (1) Whether respondent timely issued notices of deficiency, and if so, (2) whether decedent was "protected against loss" within the meaning of section 465(b)(4) with respect to his pro rata share of partnership debt obligations arising from sale-leaseback transactions engaged in by a partnership, and (3) whether additions to tax under sections 6653(a) and 6661(a) and increased interest under section 6621(c) are applicable.

This case was submitted fully stipulated. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Background

Petitioner is the Estate of Jack L. Bradley (the estate). John S. Bradley, successor executor, C.T.A., of the estate was a resident of the State of Washington at the time the petition herein was filed.

Decedent (who died in 1989) and his wife (who died in 1986) filed joint Federal income tax returns for the taxable years 1982 and 1983. Decedent claimed net operating loss carrybacks from the taxable years 1985 and 1986 to the taxable years 1982 and 1983 attributable to deductions of loss and investment interest expense (the claimed deductions) relating to Hambrose Leasing 1984-5 (the partnership) in the following amounts:

| Original Year | Carryback Year | Amount |
|---|---|---|
| 1985 | 1982 | $309,869 |
| 1985 | 1983 | 150,730 |
| 1986 | 1983 | 386,066 |

This case involves two sale-leaseback transactions, among the following entities: Hambrose Leasing 1984-5, a partnership engaged in the equipment leasing business; Charterhouse Leasing Associates Limited Partnership (Charterhouse); Hambrose Reserve Ltd. (Hambrose); M & J Holding Corp. (M & J), the sole shareholder of Hambrose and the general partner of Charterhouse; CIS Leasing Corp. (CIS); and Comdisco, Inc. (Comdisco).

The Sale-Leaseback Transactions

The transactions can be described in general as follows: CIS and Comdisco purchased with a combination of cash and borrowed funds IBM computer equipment, which they then sold to Charterhouse, subject to the original financing. Charterhouse then (1) leased the equipment to various operating companies who actually used the equipment, and (2) sold the equipment to Hambrose, subject to the original financing and the user leases. Hambrose then sold the equipment to the partnership, subject to the original financing and the user leases. At the end of the day, the partnership owned the computers, the operating companies used them, and Charterhouse, Hambrose, and the partnership traded streams of financing payments and lease payments. The transactions are described in more detail, as follows.

The Initial Equipment

CIS financed, on a nonrecourse basis, the purchase of certain IBM computer equipment (the initial equipment), for a total purchase price of $589,791.26. Charterhouse then paid CIS $419,132.00 for the initial equipment, in the form of cash, a note, and an assumption of liabilities. These liabilities were nonrecourse as to Charterhouse. All of the initial equipment was leased by Charterhouse to Fluor Corporation, the actual end user of the equipment. On or about March 19, 1984, Hambrose purchased the initial equipment from Charterhouse for $419,132.00, subject to the liens of the original third-party lender, and the user

lease.  This $419,132.00 purchase price was payable as follows: $47,000.00 in cash on May 8, 1984, and in 85 consecutive monthly installment payments of $6,287.99 each, with the first payment due on April 1, 1984.  The purchase agreement between Hambrose and Charterhouse contained the following provision:

> 6.    Indemnification.
>
> Seller will indemnify Purchaser and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorney's fees, wheresoever and howsoever arising which Purchaser or its subsidiaries or stockholders, or any of its, or their, directors, officers, agents, employees, stockholders or partners, may incur by reason of any material breach by Seller of any of the representations by, or obligations of, Seller set forth in this Agreement or by reason of the Bulk Sales Laws of any jurisdiction. * * *

Hambrose then leased back the initial equipment to Charterhouse pursuant to the terms of a wrap lease, which provided for 85 consecutive monthly rent payments of $6,287.99 each, with the first payment due on April 1, 1984.  Under the wrap lease, the lessee waived "any right of set-off under state or federal law, counterclaim, recoupment, defense or other right which Lessee may have against Lessor or anyone else for any reason whatsoever".

The lease agreement contained the following provision:

18. <u>Indemnification</u>

18.1 Lessee will indemnify Lessor and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys' fees, wheresoever and howsoever arising which Lessor or its subsidiaries or shareholders, or any of its or their directors, officers, agents, employees, stockholders or partners, may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease or in any way relating to or arising out of this Lease, the Equipment, claims of holders of the Lien or Underlying Leases; * * *

On March 19, 1984, the partnership purchased the initial equipment from Hambrose for $419,132.00 subject to the liens of the original third-party lender, a lien on and security interest in the initial equipment on the part of Hambrose, and the user lease and the initial equipment wrap lease. This $419,132.00 purchase price was payable as follows: $1,000.00 in cash on May 8, 1984, $48,000.00 in cash on December 31, 1984, and then in 85 consecutive monthly installment payments of $6,287.99 each, with the first payment due on April 1, 1984. This note was nonrecourse as to the partnership.[2]

These payments were subject to deferral until September 30, 1992, if the partnership did not receive amounts due it from Charterhouse. The partnership anticipated that a substantial portion of a limited partner's return would depend on the residual value of the equipment (for resale or release purposes)

---

[2] <u>Hambrose Leasing v. Commissioner</u>, 99 T.C. 298, 301, 312 (1992); see <u>infra</u> note 9.

at the end of the wrap lease and user lease. The purchase agreement contained the identical indemnification provision as the Hambrose-Charterhouse purchase agreement.

In conjunction with the partnership's purchase of the initial equipment, Hambrose assigned to the partnership the initial equipment wrap lease, as a result of which the 85 consecutive monthly rent payments of $6,287.99 each would be paid to the partnership.

### The Additional Equipment

Comdisco purchased certain additional IBM computers (the additional equipment). It financed the purchase of some of the additional equipment, amounting to $10,581,596.75 on a nonrecourse basis through five different third-party lenders. Comdisco paid cash for the rest of the additional equipment, but the parties have no record of the exact amount of this payment. Comdisco leased the additional equipment to seven different end users.

Charterhouse purchased the additional equipment from Comdisco for a total purchase price of $14,993,873.[3] The purchase price was a combination of cash payments, promissory notes, and the assumption of Comdisco's financial obligations with respect to some of the additional equipment. These notes

---

[3] Presumably the difference between this figure and the amount of Comdisco's financing is accounted for by the cash payments for the additional equipment.

and assumed liabilities were nonrecourse obligations as to Charterhouse.

Hambrose then purchased the additional equipment from Charterhouse for $14,421,478, subject to all other liens and leases, including the liens and leases of the original third-party lenders, Comdisco, and user leases.  The $14,421,478 purchase price was payable by $1,700,000 in cash and by a note, payable in nine installments of principal and interest as follows:

| Year | Amount |
|------|--------|
| 1984 | $   412,833 |
| 1985 | 1,696,747 |
| 1986 | 1,883,388 |
| 1987 | 2,090,561 |
| 1988 | 2,320,522 |
| 1989 | 2,575,780 |
| 1990 | 2,859,116 |
| 1991 | 3,173,618 |
| 1992 | 2,571,326 |

The purchase agreement contained the identical indemnification provision as the Hambrose-Charterhouse purchase agreement relating to the initial equipment.

Hambrose then leased the additional equipment back to Charterhouse pursuant to a wrap lease.  As with the initial equipment, the wrap lease provided for no rights of set-off.  The lease agreement contained the identical indemnification provision as the wrap lease of the initial equipment.  The annual payments due Hambrose from Charterhouse under the wrap lease were

identical to the installment payments due Charterhouse from Hambrose under the note, described above.

The partnership purchased the additional equipment from Hambrose for $14,421,478, subject to all other liens and leases, including those of the original third-party lenders, Comdisco, and Hambrose.  The $14,421,478 purchase price was paid by $1,442,148.00 in cash, and by an installment note secured by the additional equipment, and payable as follows:

| Year | Amount[4] |
|------|-----------|
| 1984 | $   519,173 |
| 1985 | 2,076,693 |
| 1986 | 2,076,693 |
| 1987 | 3,051,822 |
| 1988 | 2,320,522 |
| 1989 | 2,575,780 |
| 1990 | 2,859,116 |
| 1991 | 3,173,618 |
| 1992 | 2,571,326 |

This note was nonrecourse as to the partnership,[5] and subject to deferral if the partnership did not receive amounts due it from Charterhouse, for up to 96 months, until September 30, 1992.  As with the initial equipment, the partnership anticipated that a substantial portion of a limited partner's return would depend on

---

[4]  The first four amounts differ slightly from those rental payments pursuant to the wrap lease and installments on the note payable by Hambrose to Charterhouse.  We do not consider these differences significant.  See Waq-A-Bag Inc. v. Commissioner, T.C. Memo. 1992-581.

[5]  Hambrose Leasing v. Commissioner, 99 T.C. 298, 301, 312 (1992); see infra note 9.

the residual value of the equipment (for resale or release purposes) at the end of the wrap lease and user lease. The purchase agreement contained the identical indemnification provision as the Hambrose-Charterhouse purchase agreement with respect to the initial equipment.

The additional equipment wrap lease, with the following schedule of annual payments, was assigned to the partnership pursuant to its purchase of the additional equipment:

| Year | Amount |
|------|--------|
| 1984 | $ 412,833 |
| 1985 | 1,696,747 |
| 1986 | 1,883,388 |
| 1987 | 2,090,561 |
| 1988 | 2,320,522 |
| 1989 | 2,575,780 |
| 1990 | 2,859,116 |
| 1991 | 3,173,618 |
| 1992 | 2,571,326 |

The Partnership

Investments in the partnership were offered through a private offering memorandum (POM),[6] which expired at the latest

_____

[6] Petitioner objects to the receipt of the POM in evidence on the ground that it is not an original. Fed. R. Evid. 1003 permits the admission of a duplicate "unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Petitioner has not shown either that there is any question of authenticity, nor that it would be unfair to admit what petitioner has conceded is a copy of what decedent received. Fed. R. Evid. 1001(4); Keogh v. Commissioner, 713 F.2d 496, 500 (9th Cir. 1983), affg. Davies v. Commissioner, T.C. Memo. 1981-438. Because we admit the exhibit under Fed. R. Evid. 1003, we do not address arguments under Fed. R. Evid. 1004.

(continued...)

October 31, 1984.  The partnership offered 80 units of partnership interest at a price of $45,000 each, payable in $6,000 cash, and a $39,000 note bearing 11 percent interest (payable semi-annually) payable in three installments of $13,000 on February 1, 1985, February 3, 1986, and February 2, 1987.

As a condition of becoming a limited partner, an investor was also required to assume recourse debt of $92,363 per partnership unit purchased, which represented his or her proportionate share of the note executed by the partnership in connection with the purchase of the equipment.  The partnership anticipated that the obligation assumed by the limited partners

---

[6](...continued)
Petitioner also makes a passing objection that, to the extent the POM summarizes other documents, it represents inadmissible hearsay.  First, we find that the exhibit qualifies for the "residual" exception under Fed. R. Evid. 803(24) for statements which do not fit under any other specific hearsay exception, but nonetheless are inherently trustworthy and probative, and by whose inclusion justice would be served.  See 3 Saltzburg, Fed. R. Evid. Manual at 1439 (1994).  The POM contained summaries of the agreements covering the transactions involved, the opinion letter of a law firm, financial projections by an accounting firm, and legally required disclosures for residents of 26 different States.  We are persuaded that the POM reflected a high degree of competency and reliability on the part of those involved in its preparation.  See Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1551-1553 (9th Cir. 1990) (upholding admission of SEC Registration Statement under Fed. R. Evid. 803(24)).  Moreover, its reliability is corroborated by other supporting documents in the record herein. See Osterneck v. E. T. Barwick Indus., 106 F.R.D. 327, 337 (N.D. Ga. 1984).
Second, as can be seen from the discussion below, while the exhibit does serve to illustrate the transaction at issue, the elements upon which we rely in reaching our conclusion all have a separate evidentiary basis.

pertained to the last installments of the partnership note, due between January 1, 1990, and January 1, 1992, and payable no later than September 30, 1992. According to the subscription agreement, Hambrose had the right to pursue a limited partner for the amount of the unpaid balance of his or her pro rata share of the assumed portion of the partnership note at maturity.

The POM included the following projection of tax benefits per partnership unit for the first years of the transaction:

| Year | Investment | Projected Tax Loss | Loss as a Percent of Investment |
|------|-----------|-----------|-----------|
| 1984 | $ 6,000 | $24,547 | 409 |
| 1985 | [1]13,000 | 44,289 | 341 |
| 1986 | [1]13,000 | 40,050 | 308 |
| 1987 | [1]13,000 | 28,477 | 219 |
| Total | $ 45,000 | $137,363 | 305 |

[1] Does not include interest at 11 percent per annum.

The POM contained an opinion by the law firm of Friedman & Shaftan, P.C. That opinion explained in considerable detail the application of the at-risk provisions of section 465 and concluded that the transaction would likely survive a challenge by respondent.

## Decedent's Decision to Invest

During the fall of 1984, decedent executed subscription documents to purchase 10 units in the partnership, for which he paid a total of $450,000 cash over the period from 1984 through

1987.  The amount of recourse debt which decedent was required to assume totaled $923,630.

Decedent met Robert Michaels (Mr. Michaels) in the early 1980's.  Mr. Michaels was a certified public accountant, practicing income tax and general accounting since 1969, worked in an accounting firm, and directed staff.

Mr. Michaels learned of the partnership from a client, then told decedent about it.  Decedent consulted with Mr. Michaels concerning the investment in the partnership.  Mr. Michaels reviewed the POM, including the opinion letter; he also was of the opinion that a partner would be at-risk for the amount of partnership debt which a partner was required to assume.

Mr. Michaels consulted with decedent's tax counsel, David Weinstein (Mr. Weinstein), about the investment.  Based on this consultation with Mr. Weinstein, the opinion letter in the POM, and his own analysis, Mr. Michaels approved the investment, which decedent then made.

Mr. Michaels prepared for decedent and Mrs. Bradley joint Federal income tax returns for the taxable years which included the deductions at issue, 1984, 1985, and 1986.

Procedural Background

Decedent filed Form 1045 (regarding loss carrybacks to previous years) for the taxable year 1985 on or before September 26, 1986, and filed Form 1045 for the 1986 taxable year on or before October 5, 1987.  Respondent issued a notice of

final partnership administrative adjustment (the FPAA) to the partnership for the tax years 1985 and 1986 on December 2, 1991. On March 2, 1992, the partnership filed a petition with this Court challenging the correctness of the FPAA, but making no claim that it was not timely. That case was captioned Hambrose Leasing 1984-5 Limited Partnership, Barry M. Goldwater, Jr., Tax Matters Partner v. Commissioner, under docket number 4539-92, and we will hereinafter refer to it as Hambrose II.

On September 1, 1992, this Court issued its opinion in a related case, pertaining to the 1984 tax year, Hambrose Leasing v. Commissioner, 99 T.C. 298 (1992), which we hereinafter refer to as Hambrose I. In Hambrose I, we held that the issue of whether a partner is at risk under section 465 must be decided in a partner-level proceeding, not in a partnership-level proceeding. In that opinion, we also decided that, for purposes of any subsequent litigation involving the partnership, the installment note for the additional equipment was nonrecourse as to the partnership. Id. at 303, 312. The decision in that case was entered on September 24, 1992, and became final on December 23, 1992.

On October 6, 1993, this Court granted respondent's motion in Hambrose II to dismiss for lack of jurisdiction with respect to the at-risk issue under section 465, and all references to this issue were stricken from the pleadings. On May 27, 1994, we entered a decision in Hambrose II based on a stipulated

settlement agreement under Rule 248(a) in which respondent accepted as filed the partnership items for the taxable years 1985 and 1986 of the partnership. This decision became final August 25, 1994.

On June 23, 1995, respondent issued statutory notices of deficiency to decedent, one for the 1982 tax year, and one for the 1983 tax year, in which the carryback of claimed deductions for 1985 and 1986 with respect to the partnership were disallowed, and additions to tax and increased interest were asserted. Courtesy copies of these notices were erroneously addressed to counsel for decedent's estate at 4157 Chain Bridge Road, Fairfax, Virginia 22030, but were delivered to the correct address of 4153 Chain Bridge Road, Fairfax, Virginia 22030.

## Discussion

### Untimely Notice

Petitioner makes a two-pronged argument that the notices of deficiency herein were untimely because they were not issued within 3 years from the dates of filing of decedent's returns for 1982 and 1983 as provided in section 6501(a). First, it argues that section 6501(a) applies because respondent did not issue a timely FPAA pursuant to section 6229(a). That section provides that respondent has 3 years from the date of the filing of the partnership return in which to assess the tax based on any

partnership or "affected" item.[7]  If an FPAA is issued before the end of the 3-year period of limitations of section 6229(a), that period is suspended for the time during which a partnership-level proceeding is brought and a decision in that proceeding becomes final, and for 1 year thereafter.  Sec. 6229(d).

Petitioner's argument is without merit.  It is well established that the issue of the timeliness of an FPAA must be raised during the partnership-level proceeding, and thus may not be raised subsequently by petitioner in this partner-level proceeding.  Crowell v. Commissioner, 102 T.C. 683, 693 (1994).

Second, petitioner argues that the notices were untimely because respondent artificially extended the partnership proceeding by needless delay and thus should be estopped from issuing the notices.  This argument is equally meritless.  Estoppel constitutes an affirmative defense with the result that, in respect of its impact on the timeliness of the notices of deficiency, the burden of proof is on petitioner.  Rules 39, 142(a); Hofstetter v. Commissioner, 98 T.C. 695, 701 (1992).

We see no need to detail the various elements which are essential to a successful assertion of equitable estoppel.  See Lignos v. United States, 439 F.2d 1365, 1368 (2d Cir. 1971); Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 59-61,

---

[7]  Consistent with our decision in Hambrose Leasing v. Commissioner, 99 T.C. 298 (1992), the deductions at issue are "affected" items.

supplemented 104 T.C. 417 (1995); Hofstetter v. Commissioner,
supra at 700-701 (1992), and cases cited thereat.  It is
sufficient to note that estoppel of the Government is applied
with great restraint, Hofstetter v. Commissioner, supra, and that
petitioner has failed to show that it has met any of these
conditions.  In this connection, we note that, as our findings of
fact show, decedent was aware at an early date of the at-risk
problem, i.e., before the expiration date of the POM, October 31,
1984, at the latest, and that he was presumably aware by way of
notice from respondent and from the tax matters partner of the
proceeding in Hambrose I where a petition was filed in 1988.
Sec. 6223(a), (g).  We fail to see how petitioner can claim
surprise, hardship, or prejudice sufficient to cause us to
sustain a defense which would require us to hold that petitioner
should totally prevail herein.  See and compare Vermouth v.
Commissioner, 88 T.C. 1488 (1987).

It is clear that respondent complied with the statute and
that the notices were timely under section 6229(a) because (1)
there was an FPAA issued to the partnership, (2) a proceeding was
instituted in this Court based on that FPAA, (3) that proceeding
was decided on May 27, 1994, and became final on August 25,1994,[8]

---

[8]  A stipulated decision, though generally not subject to
appeal except on jurisdictional grounds, Clapp v. Commissioner,
875 F.2d 1396 (9th Cir. 1989), is still considered a reviewable
decision which becomes final 90 days after entry of decision.
Pesko v. United States, 918 F.2d 1581 (Fed. Cir. 1990); Sherry
(continued...)

and (4) the notices of deficiency were mailed within one year thereafter, on June 23, 1995.

## At-Risk

We must now decide whether decedent was at risk for his assumed liability in the context of the sale-leaseback transactions. Because respondent first raised the at-risk issue in the answer, respondent bears the burden of proof, and so concedes on brief.

Section 465(a) provides that deductions with respect to the type of leasing activity represented by this case are only allowable to the extent of the amount for which the taxpayer is at risk. Generally, a taxpayer will, subject to the exception in section 465(b)(4), discussed below, be considered at risk for the amount of any cash investment. Sec. 465(b)(1)(A). Also, a taxpayer will be considered at risk for the amounts borrowed with respect to the activity, to the extent that the taxpayer is personally liable for the repayment of such amounts. Sec. 465(b)(2)(A).

Respondent concedes that the partnership's transaction had a business purpose with economic substance, was engaged in for profit, and that the partnership's equipment was correctly

---

[8](...continued)
Frontenac, Inc. v. United States, 868 F.2d 420 (11th Cir. 1989); Security Indus. Ins. Co. v. United States, 830 F.2d 581 (5th Cir. 1987) (all cited in Ripley v. Commissioner, 105 T.C. 358, 362 (1995), revd. on other grounds 103 F.3d 332 (4th Cir. 1996)).

valued.  Respondent has also conceded that decedent was at risk in the amount of his $450,000 cash investment and was personally liable for the debt which decedent assumed upon purchasing his interest in the partnership.  Nevertheless, respondent contends that decedent was not at risk, for the amount of assumed partnership debt under section 465(b)(4), which provides:

> (4) Exception.--Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

Respondent does not contend that decedent was protected by guarantees or stop loss agreements, but rather by nonrecourse financing and "other similar arrangements".

When analyzing a transaction under section 465(b)(4), we use the "realistic possibility" or "economic reality" test set forth in American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990) (sometimes cited as Baldwin v. United States), and approved by this Court in Levien v. Commissioner, 103 T.C. 120, 126 (1994), affd. without published opinion 77 F.3d 497 (11th Cir. 1996).

This test asks:

> whether there is any realistic possibility that the taxpayer ultimately will be subject to economic loss on the investment at issue.  * * * [Levien v. Commissioner, 103 T.C. at 126]

In applying this standard, we are guided by the substance of the transaction, not its form.  Id. at 129.  We look not to any

single factor, id. at 127, but to whether the combination of factors and characteristics of the transaction rises to the level of an "other similar arrangement" with the effect of protecting decedent against risk.

Respondent first stresses the nonrecourse nature of the indebtedness involved in the transaction. In Hambrose Leasing v. Commissioner, 99 T.C. at 301, 303, 312, we decided that, for purposes of any subsequent litigation involving this partnership, the partnership's indebtedness involved in the purchase of both the initial and additional equipment was nonrecourse.[9] Where decedent is personally liable for his share of partnership debt by virtue of his assumption of the nonrecourse liability, the presence of that same nonrecourse liability cannot also be said to be a factor insulating him from risk. See Hayes v. Commissioner, T.C. Memo. 1995-151; Wag-A-Bag Inc. v. Commissioner, T.C. Memo. 1992-581, and cases cited therein.

---

[9] Petitioner insists we must not carry over the findings from one case into another. However, any affected items proceeding will necessarily involve determinations made at the partnership level. Sec. 6231(a)(5); see Brookes v. Commissioner, 108 T.C. 1 (1997); Kafka & Cavanagh, 1 Litigation of Federal Civil Tax Controversies par. 9.04[1], at p. 9-5 (2d ed. 1997). To that extent, petitioner's argument that it ought not be bound by our findings in a "separate" proceeding is without merit.

Petitioner also presents argument as to why res judicata by Hayes v. Commissioner, T.C. Memo. 1995-151 (a case dealing with a similar partnership organized by Hambrose and Charterhouse) should not apply in this case. Respondent has not asserted res judicata, and we do not apply it.

We next look to see whether there were other elements of the transactions which protected decedent against loss. We note initially that respondent's argument that the financial solvency and good credit rating of the various parties to the transaction made decedent less at risk was specifically rejected in Gefen v. Commissioner, 87 T.C. 1471 (1986).

Respondent next emphasizes the circular nature of the payments--the partnership's debt payments were exactly offset by the rental payments it received from Hambrose. This circularity is set forth in the stipulation and the stipulated documents as well as the POM. As we have previously held, circular payments do not per se constitute "other similar arrangements" for purposes of section 465(b)(4). Krause v. Commissioner, 92 T.C. 1003, 1024 (1989). Nevertheless, they are a factor to be considered. Levien v. Commissioner, 103 T.C. at 126.

Respondent also contends that the deferral provisions operated to protect decedent against loss. The sale or re-leasing of the equipment at the end of the transactions, which could have provided funds to satisfy deferred liabilities, was viewed as a significant source of return on the investment. It is clear that debt obligations payable in the future are included in the amount for a which a partner is considered personally liable for purposes of section 465(b)(2). Melvin v. Commissioner, 88 T.C. 63, 73 (1987), affd. 894 F.2d 1072 (9th Cir. 1990). Thus, we cannot simultaneously propose a rule that

the deferral of debt obligations into the future represents per se an "other similar arrangement" for section 465(b)(4). However, the presence of deferral provisions is another factor to be considered in deciding whether a taxpayer is protected against loss. See Santulli v. Commissioner, T.C. Memo. 1995-458.

One other element needs to be taken into account. As set forth in our findings of fact, the purchase agreement and lease agreement between Charterhouse and Hambrose, and the purchase agreement between Hambrose and the partnership, each contained provisions for indemnification. We think that these provisions constitute collateral agreements under American Principals Leasing Corp. v. United States, 904 F.2d at 482; see Waq-A-Baq Inc. v. Commissioner, supra. We see the indemnification agreements as constructing a "fire wall" which would have stopped the spread of losses at Hambrose, with the effect of protecting the partnership and decedent from loss.

In Hayes v. Commissioner, T.C. Memo. 1995-151, we analyzed a similar partnership (Hambrose Leasing-5) involving Comdisco, Hambrose, and Charterhouse. In that case, Comdisco was the original purchaser of computer equipment, which was transferred through Charterhouse and Hambrose to a partnership, subject to third-party liens, and user and wrap leases. The transactions contained the same type of circular payments, and the same type of deferral provisions as in this case, and a functional guarantee similar to the indemnification provisions herein. In

holding that the taxpayer was not at risk for purposes of section 465(b)(4), we found that the differences between that case and the other cases applying the "economic reality" standard were simply window dressing. See Hayes v. Commissioner, supra; Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990). We see the facts of this case similarly. While one could certainly distinguish the instant case on certain points from many of the cases cited by the parties,[10] we do not, in the final analysis, find it sufficiently distinguishable, so that we could find that decedent was at risk for the amounts of assumed indebtedness.

Petitioner points out that the decisions supporting respondent's position herein, including those which we have cited and many others, have been decided on the basis of the taxpayers' failure to carry their burden of proof that they were at risk and do not hold that the taxpayers were not at risk. On this ground, petitioner argues that those decisions are not sufficient to permit us to conclude herein that respondent has carried the burden of proving that the decedent was not at risk in respect of his share of the partnership obligations which he assumed.

---

[10] In particular, we find many cases where this Court has held for the taxpayer on the at-risk issue in similar transactions unhelpful because the Court used a "worst case scenario" standard instead of the "realistic possibility" standard now used by this Court. See Levy v. Commissioner, 91 T.C. 838 (1988); Emershaw v. Commissioner, T.C. Memo. 1990-246, affd. 949 F.2d 841 (6th Cir. 1991); Brady v. Commissioner, T.C. Memo. 1990-626.

We think petitioner oversimplifies the situation. It is technically correct that those decisions only went as far as determining that the taxpayers had not carried their burden that they were at risk. But it does not follow that the elements which formed the foundation of those decisions were not sufficient to support a decision that a taxpayer is in fact not at risk, a position on which respondent has the burden of proof herein. Our task is to decide whether the record herein contains sufficient evidence to enable us to hold that respondent has carried that burden.

We think that the circularity of payments, the deferral provisions, and the indemnity provisions, each of which independently might not have risen to the level of "other similar arrangements" under section 465(b)(4), when taken together, are sufficient to satisfy respondent's burden that decedent, while nominally "personally liable" for the assumed liabilities under section 465(b)(2), was effectively immunized from any realistic possibility of suffering an economic loss under section 465(b)(4), was not at risk, and is not entitled to the deductions in question. <u>Levien v. Commissioner</u>, 103 T.C. 120 (1994). We so hold.

Additions

Section 6621(c)

Respondent seeks increased interest pursuant to section 6621(c). That section provides for an increase in the interest rate to 120 percent of the statutory rate on underpayments of tax if a substantial understatement is due to a tax-motivated transaction. Certain transactions are deemed to be "tax motivated" by section 6621(c)(3), including any loss disallowed under section 465(a). Sec. 6621(c)(3)(A)(ii).

Petitioner contends that the notice did not include any reference to section 6621(c) because such reference was contained only in the worksheet, and not on the first page of the notice itself. The worksheet, which was dated several days before the statutory notice, and was attached to the statutory notice, explained the deficiencies. However, a notice of deficiency includes the cover page and all attached pages and documents. Goldman v. Commissioner, T.C. Memo. 1993-480, affd. 39 F.3d 462 (2d Cir. 1994). Furthermore, the purpose of a notice of deficiency is to advise the taxpayer of respondent's assertions. The worksheets attached to the notices of deficiency, each a Form 1902C (Report of Individual Income Tax Examination Changes), clearly gave petitioner notice that respondent would be seeking to charge interest "to be computed at 120% of normal rates, Per IRC Section 6621(c), for Tax Motivated Transactions." The fact that this line was not printed on the first page of the notices

of deficiency is insufficient to support petitioner's position. Thus, petitioner's arguments that respondent never raised the section 6621(c) issue are without merit.[11]

Since we have concluded that the loss deductions in issue are disallowed under section 465(a), it follows that the activities were tax-motivated transactions under section 6621(c)(3). We therefore sustain respondent on this issue.

<u>Section 6653(a) (Negligence)</u>

Respondent has determined an addition to tax under section 6653(a) for negligence. Petitioner claims it should not be liable for the addition because decedent reasonably relied on the advice of his accountant, Mr. Michaels, in making the investment.

We see no need to explore the details of how decedent sought and obtained professional advice in respect of the tax consequences attaching to his investment in the partnership. We are satisfied that he recognized the necessity of seeking such advice, that he sought it from his accountant, Mr. Michaels, who had sufficient experience to render such advice, and with whom decedent discussed the tax implications. He received that advice from Mr. Michaels, advice based upon reasonable investigation and analysis of all relevant information, including consultation with

---

[11] In this context, we consider and reject petitioner's argument based on <u>Fowler v. Commissioner</u>, 6 B.T.A. 250 (1927). That case involved the attempt by respondent to supplement the <u>Answer</u> with a letter predating the notice of deficiency, not a letter <u>attached</u> to the notice.

decedent's tax lawyer.[12] That advice was also consistent with the opinion of counsel set forth in the POM. We also note that, at the time decedent made his investment, as our subsequent discussion in respect of the addition to tax under section 6661 reveals, most of the pertinent decisions had not been handed down so that there was at best a shortage of authority setting forth legal principles governing the tax consequences arising from the at-risk provisions of section 465.[13]

We think the foregoing circumstances meet the standard established in United States v. Boyle, 469 U.S. 247, 251 (1985), where the Supreme Court stated: "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice."

---

[12] Respondent objects to portions of Mr. Michaels' testimony on the grounds of inadmissible hearsay. In many respects, respondent's objections appear to be well taken. Accordingly, we have confined our findings to those elements of Mr. Michaels' testimony which clearly involve facts as to his views and actions, and not to what others said. Under these circumstances, we find it unnecessary to dissect Mr. Michaels' testimony and detail the portions in respect of which respondent's objection might be sustained. Respondent also objects to the testimony of Mr. Michaels that he thought decedent would be at risk as a legal conclusion. It is precisely that conclusion for which decedent consulted Mr. Michaels. It is the fact that it was rendered, and not its substantive correctness, that we find relevant here.

[13] See discussion in Andrews v. Commissioner, T.C. Memo. 1985-380 (no negligence under sec. 6653(a) because the fact that a type of transaction was universally disapproved by courts not clear at the time taxpayers entered into transaction).

We conclude that decedent made a reasonable effort to obtain, and in fact received, appropriate advice in respect of his investment and that he therefore was not negligent within the meaning of section 6653(a).

Section 6661(a) (Substantial Understatement)

Respondent has asserted additions to tax under section 6661(a) for substantial understatement. Petitioner contends that there was substantial authority for decedent's return position that would operate to eliminate the substantial understatement. Sec. 6661(b)(2)(B)(ii).

In this case, resolution of the at-risk issue is based primarily on a conclusion drawn from complex and interrelated contractual documents. See Waters v. Commissioner, T.C. Memo. 1991-462, affd. 978 F.2d 1310 (2d Cir. 1992). The facts of this case are similar to the facts of a number of other cases in which taxpayers prevailed and were found by this Court to be at risk with respect to sale-leaseback transactions. See, e.g., Levy v. Commissioner, 91 T.C. 838 (1988); Gefen v. Commissioner, 87 T.C. 1471 (1986); Brady v. Commissioner, T.C. Memo. 1990-626; Emershaw v. Commissioner, T.C. Memo. 1990-246, affd. 949 F.2d 841 (6th Cir. 1991). We have also found that many similarly situated taxpayers, who did not prevail and were found to be not at risk, nevertheless had substantial authority for positions taken on their returns. See Waters v. Commissioner, supra; Epsten v. Commissioner, T.C. Memo. 1991-252; Moser v. Commissioner, T.C.

Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990); <u>B & A</u>

<u>Distributing Co. v. Commissioner</u>, T.C. Memo. 1988-589.

On the facts of this case, with regard to the at-risk issue, we find that there existed substantial authority for decedent's return position.  We therefore hold that petitioner is not liable for the section 6661 additions to tax.

To reflect the foregoing,

<u>An appropriate decision</u>

<u>will be entered</u>.